IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TELEVISION EVENTS & MARKETING, INC., a Hawaii Corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>AMCON DISTRIBUTING CO., a Delaware Corporation; THE BEVERAGE GROUP, INC., a Delaware Corporation; THE BEVERAGE GROUP aka AMCON BEVERAGE COMPANY; AMCON CORPORATION, a Delaware Corporation; and WILLIAM F. WRIGHT,<br><br>        Defendants. | Civ. No. 05-00259 ACK/KSC |

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS WILLIAM F. WRIGHT'S AND AMCON CORPORATION'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT THE BEVERAGE GROUP, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANT AMCON DISTRIBUTING COMPANY'S MOTION FOR SUMMARY JUDGMENT

PROCEDURAL BACKGROUND

On March 8, 2005, Television Events & Marketing, Inc. ("Plaintiff" or "TEAM") filed a Complaint in the Circuit Court of the First Circuit of the State of Hawaii against AMCON Distributing Company; The Beverage Group, Inc.; and Trinity Springs, Inc. (collectively "Original Defendants") alleging (1)

1

breach of license agreements and (2) fraudulent transfer under Hawaii Revised Statutes ("HRS") §§ 651C-4 and 651C-5.   The Complaint was removed to this Court on April 12, 2005.

On May 5, 2005, Original Defendants filed a Motion to Dismiss and for Summary Judgment and to Transfer Venue ("Original Defendants' Motion for Dismissal and Summary Judgment").

On September 1, 2005, Plaintiff filed a First Amended Complaint adding Defendants The Beverage Group aka AMCON Beverage Company and William F. Wright (collectively "Additional Defendants") and an Opposition to Original Defendants' Motion to Dismiss and for Summary Judgment.

On September 27, 2005, a hearing on Original Defendants' Motion was held.

On September 29, 2005, the Court issued a written Order Denying AMCON Distributing Company's Motion To Dismiss for Lack of Personal Jurisdiction; Granting Defendants' Request to Amend their May 5, 2005 Motion; Denying Defendants AMCON Distributing Company's and The Beverage Group, Inc.'s Motion for Summary Judgment as to Plaintiff's First Claim for Relief and Not Addressing the Motion as to The Beverage Group, William F. Wright, and AMCON Corporation; Denying Defendants AMCON Distributing Company's and The Beverage Group, Inc.'s Motion for Summary Judgment as to the Plaintiff's Second Claim for Relief and Not Addressing the Motion as to William F. Wright and Trinity

2

Springs, Inc.; and Denying Defendants' Motion To Transfer Venue. ("September 29, 2005 Order").

On October 5, 2005, Additional Defendants filed a Motion to Dismiss or to Transfer Venue.

On December 2, 2005, Plaintiff filed a Motion for Leave to File a Second Amended Complaint.

On December 15, 2005, Original Defendants filed a Joinder to Additional Defendants' Motion for Dismissal or Transfer.

On December 19, 2005, the parties stipulated to the filing of a Second Amended Complaint.  On December 21, 2005 Plaintiff filed a Second Amended Complaint (hereafter "Complaint") against AMCON Distributing Company, The Beverage Group, Inc., The Beverage Group aka AMCON Beverage Company, AMCON Corporation, and William F. Wright (collectively "Defendants"). Trinity Springs Inc. was removed as a defendant from the Second Amended Complaint.

A hearing was held on Additional Defendants' Motion for Dismissal or Transfer on January 9, 2006.

On January 10, 2006, Defendants AMCON Distributing Company and The Beverage Group, Inc. filed an Answer to the Second Amended Complaint.

On January 18, 2006, the Court issued a written Order Denying AMCON Corporation's and William F. Wright's Motion to

3

Dismiss for Lack of Personal Jurisdiction; Denying AMCON Corporation's and William F. Wright's Motion to Transfer for Lack of Personal Jurisdiction or Improper Venue; and Denying AMCON Corporation's and William F. Wright's Motion to Transfer for Convenience ("January 18, 2006 Order").

On January 25, 2006, the Court approved a joint stipulation to extend the deadline for filing dispositive motions to February 13, 2006.

On January 27, 2006, Defendants AMCON Corporation and William F. Wright filed an Answer to the Second Amended Complaint.

On February 13, 2006, the following four dispositive motions, each with an accompanying Separate Concise Statement of Facts, were filed: 1) Plaintiff's Motion for Partial Summary Judgment against Defendant AMCON Distributing Company ("Motion 1"); 2) Defendants AMCON Corporation's and William F. Wright's Motion for Summary Judgment ("Motion 2"); 3) Defendant The Beverage Group, Inc.'s Motion for Partial Summary Judgment ("Motion 3"); and 4) Defendant AMCON Distributing Company's Motion for Summary Judgment ("Motion 4").  AMCON Distributing Company also filed a Joinder to Motion 3.

On March 23, 2006, Defendants AMCON Distributing Company and The Beverage Group, Inc. filed a Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment

("Opposition to Motion 1") and a Separate Concise Statement of Facts in support of their Opposition ("Opposition to Motion 1 CSF").  Plaintiff filed a Memorandum in Opposition to: (1) Motions for Summary Judgment of Defendants William F. Wright, AMCON Corporation and AMCON Distributing Company; and (2) Motion for Partial Summary Judgment of Defendant The Beverage Group, Inc. ("Plaintiff's Opposition") and a Separate Concise Statement of Facts ("Plaintiff's Opposition CSF").

On March 30, 2006, Plaintiff filed a Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment ("Reply to Motion 1").  Defendants William F. Wright and AMCON Corporation filed a Reply Memorandum in Support of Motion for Summary Judgment ("Reply to Motion 2") and a Separate Concise Statement of Facts ("Reply to Motion 2 CSF").  Defendant The Beverage Group, Inc. filed a Reply Memorandum in Support of Motion for Partial Summary Judgment ("Reply to Motion 3").  Defendant AMCON Distributing Company filed a Reply Memorandum in Support of Motion for Summary Judgment ("Reply to Motion 4") and a Separate Concise Statement of Facts ("Reply to Motion 4 CSF").

On April 10, 2006, a hearing was held before the Court regarding the four motions for summary judgment.

## FACTUAL BACKGROUND[1/]

The Court has laid the facts of this case out in great detail in its September 29, 2005 Order and January 18, 2006 Order, and provides a summary of the most pertinent facts at this time. The lawsuit in question stems from Television Events & Marketing, Inc.'s ("Plaintiff" or "TEAM") allegations that the following Defendants are liable for the breach of two License Agreements and misrepresentations: (1) AMCON Distributing Company ("Distributing"); (2) The Beverage Group, Inc. ("TBG, Inc."); (3) The Beverage Group ("Group"); William F. Wright ("Wright"); and (5) AMCON Corporation ("AC").

---

[1/] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

Parties that oppose a motion for summary judgment are required to submit a "separate document containing a concise statement that: (1) accepts the facts set forth in the moving party's concise statement; or (2) sets forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Local Rule 56.1(b). "[M]aterial facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party." LR 56.1(g). Plaintiff's Opposition CSF to Defendants' three motions for summary judgment does not specifically accept or deny the material facts set forth by Defendants. Instead, Plaintiff lists its own set of material facts, some of which controvert Defendants' material facts. The Court does not consider the Defendants' entire statements of facts to be admitted, and will address any disputes as to material facts as they are pertinent throughout the Order. Material facts submitted by Defendants that are not controverted by Plaintiff's facts or evidence will be deemed admitted for the purpose of disposing of these motions.

In May 2002, Tom Kiely, the President of TEAM entered into informal talks with William F. Wright[2/] regarding the possibility of a license agreement regarding an energy food and drink line. After the initial discussions in the fall of 2002, Wright hired three men to pursue the possibility of entering into such license agreements with TEAM. Wright hired and paid Stephen Sparks ("Sparks"), Richard Parsons ("Parsons"), and Archie Thornton ("Thornton") (collectively "Consultants") for this purpose. At this time the negotiations between the Consultants and TEAM intensified and two License Agreements were drafted. The agreements grant permission to a licensee to use Plaintiff's registered trademark "XTERRA" ("the Mark") in connection with the manufacture, promotion, and sale of Products. (Motion 1 CSF, Exs. J & K, at 1). One License Agreement covered food Products such as energy bars, and a second License Agreement covered beverage Products, such as a line of energy drinks. (Motion 1 CSF, Ex. J at 15; Motion 1 CSF, Ex. K at 15). The numerous drafts of the agreements named the following entities as the potential licensee: "_____ corporation"; AMCON Corp. (AC); and AMCON Beverage Company. (Motion 4 at 2-3).

Throughout this entire process, Wright deposited

---

[2/] Throughout the relevant time period, Wright was the Chairman and CEO of Distributing and a director and officer of AC. On or about December 20, 2002 Wright also became a director and officer of TBG, Inc.. (Motion 4 CSF, Wright Feb. 13, 2006 Declaration ¶¶ 2, 11).

approximately $300,000 of his personal funds into the AC's bank account and then used the money to fund the pursuit of the business venture.  (Plaintiff's Opposition, Ex. V (Wright Deposition) at 49:18-23; 118:7-12).  Ultimately, Wright was reimbursed for "post-December disbursements [and] pre-December disbursements that had a post-December benefit," but remains personally "out of pocket" for over $70,000.  (Plaintiff's Opposition, Ex. V (Wright Deposition) at 52:21-53:3, 54:4-10).

On December 13, 2002, Sparks, Thornton, and Parsons presented the business opportunity outlined in the License Agreements to the Board of Directors of Distributing, who approved the venture.  (Motion 4 at 3; Motion 1 CSF at 3).  On December 20, 2002, TBG, Inc. was formed as a Delaware Corporation.  (Motion 4 at 3).  Between December 21 and 23, 2002, Sparks signed the License Agreements as the President and CEO of The Beverage Group, which was listed as the licensee for the first time.[3]  (Motion 2 CSF at 2; Motion 1 CSF, Ex. J at 13;

---

[3] Plaintiff and Distributing have both made contradictory statements regarding the intended identity of the licensee.  In his May 27, 2005 Declaration, Wright stated "[t]he Agreements are signed by the Beverage Group, not The Beverage Group, Inc., through Stephen Sparks, President and CEO."  (Wright May 27, 2005 Declaration ¶ 8).  It is now Defendants' contention that Wright erred in his Declaration because he was misled by an email from Kiely, and that Sparks intended to sign on behalf of TBG, Inc..
In Plaintiff's September 1, 2005 Separate Concise Statement of Facts and September 7, 2005 Separate Concise Statement of Facts in Opposition to Distributing's Motion to Dismiss, Plaintiff stated "Sparks executed the license agreements
**(cont.)**

8

Motion 1 CSF, Ex. K at 13).   Between January 12 and 15, 2003, Kiely signed the License Agreements on behalf of Television Events & Marketing, Inc.. (Motion 2 CSF at 4).   Both License Agreements state that they "are entered into as of October 1, 2002." (Motion 1 CSF, Ex. J at 1; Motion 1 CSF, Ex. K at 1).

AC made the first two payments pursuant to the License Agreements to TEAM on December 27, 2002. (Plaintiff's Opposition CSF, Ex. O).  The following two payments, dated January 6, 2003 were also made by AC. (Plaintiff's Opposition CSF, Ex. O). Subsequent payments were made by Distributing or TBG, Inc.. After July 2004, TEAM no longer received payments pursuant to the License Agreements from any Defendants.

Plaintiff alleges that Wright traveled to Hawaii to have dinner with Kiely on November 2, 2004, where he affirmed his and the licensee's commitment to XTERRA.  As a result, Plaintiff alleges that it "has suffered and will continue to suffer damages."  Compl. ¶ 32; Motion 4 CSF, Ex. 5 (Kiely Deposition) 144:1-4 ("not only have we lost money from last year, but we

_____

as the President and CEO of TBG, Inc., on behalf of TBG, Inc.." Plaintiff then amended its concise statement for a second time on September 14, 2005 to say "Sparks executed the license agreements as the President and CEO of TBG on behalf of TBG."  Plaintiff claimed that its first two submissions were the result of typographical errors.

The Court accepts that each party erred in making previous statements contrary to their current positions regarding the intent of Sparks when he signed the agreements and only considers the current positions of each party.

can't get anything for '05 and maybe '06"). Plaintiff alleges that it has fully performed under the agreements at all times. (Compl. ¶ 29).

## STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[4/] Fed. R. Civ. P. 56(c); Querubin v. Thronas, 107 Haw. 48, 56, 109 P.3d 689,697 (Haw. 2005).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[4/] Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence that a court may consider when determining whether a material issue of fact exists. Fed. R. Civ. P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. See British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

party.'"[5/]  <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav.
Ass'n</u>, 310 F.3d 1188, 1194 (9th Cir. 2002) (quoting <u>Union Sch.
Dist. v. Smith</u>, 15 F.3d 1519, 1523 (9th Cir. 1994)) (internal
citations omitted).  Conversely, where the evidence "could not
lead a rational trier of fact to find for the nonmoving party,
there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting
<u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

     The moving party has the burden of persuading the court
as to the absence of a genuine issue of material fact.  <u>Celotex</u>,
477 U.S. at 323.  The moving party may do so with affirmative
evidence or by "'showing'--that is pointing out to the district
court-that there is an absence of evidence to support the
nonmoving party's case." <u>Id.</u> at 325.  All evidence and
reasonable inferences drawn therefrom are considered in the light
most favorable to the nonmoving party.  <u>See, e.g.</u>, <u>T.W. Elec.
Serv. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th
Cir. 1987).  So, too, the court's role is not to make credibility
assessments.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249
(1986).  Accordingly, if "reasonable minds could differ as to the
import of the evidence," summary judgment will be denied.  <u>Id.</u> at
250-51.

---

     [5/] Disputes as to immaterial issues of fact do "not preclude
summary judgment." <u>Lynn v. Sheet Metal Workers' Int'l Ass'n</u>, 804
F.2d 1472, 1478 (9th Cir. 1986).

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. 322-23; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).  Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv., 809 F.2d at 630.  The nonmoving party must instead set forth "significant probative evidence" in support.  T.W. Elec. Serv., 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.[6]  See Celotex, 477 U.S. at 322.

---

[6] When the moving party also has the burden of proof in an element of a claim, it has the "burden of establishing a prima facie case on the motion for summary judgment." UA Local 343 of the United Ass'n of Journeymen v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1995).  Upon showing a prima facie case, the burden of production shifts and it becomes "incumbent on [the nonmoving party] to 'set forth specific facts showing that there is a genuine issue for trial,' by evidence cognizable under that rule." Id. (quoting Fed. R. Civ. P. 56(e)); Charles Alan Wright et al., Federal Practice & Procedure § 2727 (3d ed. 1998).  The ultimate burden of persuasion as to the non-existence of any genuine issues of material fact remains on the moving party. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000); accord Dye v. United States, 121 F.3d 1399, 1409 (10th Cir. 1997).

## **DISCUSSION**

In the Complaint, Television Events & Marketing, Inc. alleges that five Defendants are either directly or indirectly liable for breaches of contract and making misrepresentations. In Count 1, Plaintiff alleges that Defendants The Beverage Group, Inc. ("TBG, Inc.") and The Beverage Group are directly responsible for breaching and making misrepresentations regarding the two License Agreements.  Specifically, Plaintiff claims that TBG, Inc. and The Beverage Group 1) failed to make specified payments and 2) failed to exert "best efforts" to fulfill the License Agreements.  Plaintiff alleges that Defendants William F. Wright ("Wright"), AMCON Corporation ("AC"), and AMCON Distributing Company ("Distributing") are liable for their conduct as members of The Beverage Group.

Alternatively, in Count 2, Plaintiff alleges Wright, AC and Distributing are liable as alter egos of TBG, Inc..  In Count 3, Plaintiff contends the Court should pierce the corporate veil holding Wright, AC, The Beverage Group, and Distributing liable for TBG, Inc.'s breach of the License Agreements and misrepresentations.

The Beverage Group has never appeared in this action and Defendants assert that The Beverage Group no longer exists. (Reply to Motion 4 at 7).  The Court will deal with the following arguments in turn.

13

In Part I, the Court considers TBG, Inc.'s Motion 3 that contends the "best efforts" clauses in the License Agreements are unenforceable.

In Part II, the Court addresses Wright, AC, and Distributing's arguments in Motion 2 and Motion 4 that they are A) not members of a joint venture or doing business as ("dba") The Beverage Group; B) not liable under a promoter liability theory; C) not liable as undisclosed principals, partially disclosed principals, or agents of disclosed or undisclosed principals; and D) not liable as alter egos of TBG, Inc..

In Part III, the Court considers Plaintiff's Motion 1 that asserts there is no genuine issue of material fact in dispute as to Distributing's liability for misrepresentations and breaches of the License Agreements.

I.   **Enforceability of the "Best Efforts" Clauses**

In Motion 3, TBG, Inc. argues that it is not liable for alleged breaches of the "best efforts" clauses of the License Agreements.[7]  "The duty of best efforts 'has diligence as its essence' and is 'more exacting' than the usual contractual duty of good faith." National Data Payment Systems, Inc. v. Meridian Bank, 212 F.3d 849, 854 (3rd Cir. 2000) (quoting 2 E. Allen Farnsworth, *Farnsworth on Contracts*, 383-84 (2d ed. 1998).

---

[7]  For the purposes of disposing with Motion 3, the Court will assume that TBG, Inc. is the licensee of the License Agreements.

"Best efforts" may be expressly provided or implied from the circumstances of the case.  Pinnacle Books, Inc. v. Harlequin Enterprises Ltd., 519 F. Supp. 118, 121 (S.D.N.Y. 1981).  In Pinnacle, an author and publisher contracted that the author could only sign with another publisher if they did not reach a deal after using "best efforts" to negotiate.  Id. at 120.  The court concluded that "unlike the performance required by a distribution contract," there was no way to ascertain the performance required in a "best efforts" negotiation contract from the circumstances.  Id. at 122; see also Mocca Lounge, Inc. v. Misak, 94 A.D. 2d 761, 763 (N.Y. App. Div. 1983) (finding insufficient guidelines in a contract where the party was required to use best efforts to negotiate a lease before selling a tavern); Candid Productions, Inc. v. International Skating Union, F. Supp. 1330 (S.D.N.Y. 1982) (vague and uncertain good faith negotiation clauses are unenforceable).

In each of these cases, the contract required "best efforts" in the negotiation of a deal.  Here, the License Agreements control the production and distribution of food and drink products, where the efforts can be measured more readily.  In addition, the licensee's performance under the License Agreements for one and a half years provides helpful evidence for comparison as to what the expected "best efforts" may be.

TBG, Inc. also argues that courts should consider

15

capabilities of the parties when evaluating "best efforts" clauses and that TBG, Inc. is entitled to consider its own interests when determining what efforts are appropriate. However, TBG, Inc.'s reliance on Bloor v. Falstaff Brewing Corp., 454 F. Supp. 258, 266-67, aff'd, 601 F.2d 609 (1979), and Van Valkenburgh v. Hayden Publishing Co., 281 N.E.2d 142 (N.Y. 1972), is insufficient to dispose of TBG, Inc.'s potential liability. As the court expressed in Bloor, the "capabilities" of a party are not based on "financial abilities" alone, but also include factors such as expertise and experience.  454 F. Supp. at 267. TBG, Inc. cannot avoid liability from a "best efforts" clause simply because it would not have been profitable to continue to fulfill its obligation.

Ultimately, the exact contours of the obligation to fulfill a "best efforts" clause are unclear.  Maxim Integrated Products, Inc. v. Analog Devices, Inc., 79 F.3d 1153, 1996 WL 117425, *4 (9th Cir. 1996).[8/]  As pointed out by the Ninth Circuit, in some cases, where the information is available, the promisor's obligation is measured against the efforts exerted in past dealings where its efforts were not questioned.  See Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1373 (7th Cir. 1993).  In other cases, as in Van Valkenburgh, the promisor

---

[8/] The Court is not relying on this unpublished opinion pursuant to U.S. Ct. of App. 9th Cir. Rule 36-3, although the Court does find the opinion to be illustrative.

16

is simply barred from creating a manifest harm that leads the court to conclude the contract is breached.  281 N.E. 2d at 145 (holding that even though a book publisher was contractually obligated to use best efforts to sell an author's books, it could consider its own interests unless its actions became manifestly harmful to the author).  Moreover, the question of whether a party's regard for its own financial interest over that of another is a "fact value question."  Id.  Based on the current record, it is conceivable that TBG, Inc.'s conduct was manifestly harmful to TEAM.

In either case, as the Ninth Circuit concluded in Maxim, this question should be determined by the fact-finder.  79 F.3d 1153, 1996 WL 117425 at *3 (citing United Telecom v. American Television & Comm. Corp., 536 F.2d 1310, 1319 (10th Cir. 1976)); Van Valkenburgh, 281 N.E. 2d at 145; cf. R.B. Matthews, Inc. v. Transamerica Transp. Services, Inc., 945 F.2d 269, 273 (9th Cir. 1991) (affirming a jury's determination that a seller had an obligation to use best efforts to provide a certain number of trailers to a buyer).

Here, Plaintiff and TBG, Inc. agreed that TBG, Inc. would be the exclusive producer and distributor of energy bars, protein bars, exercise and recovery bars, and energy drink bearing the Mark.  Each License Agreement contains a clause obliging the Licensee to "exert its best efforts to maximize

distribution and sales of the Products." (Motion 1 CSF, Ex. J at 3; Motion 1 CSF, Ex. K at 3). Furthermore, "the Licensee shall commence to make best effort[s] to distribute and sell the Products no later than June 1, 2003 [April 1, 2003 for the drink contract]." Id. This modification provides additional evidence of the parties' expectations for "best efforts." Both parties should have the opportunity to present any additional evidence at trial as to whether TBG, Inc. complied with the provision. The Court may also consider the licensee's performance under the License Agreements over the first one and a half years.

Genuine issues of material fact exist as to the intent of the clause and whether the "best efforts" provisions in the License Agreements were breached. Therefore, the Court denies TBG, Inc.'s Motion for Partial Summary Judgment as it pertains to its liability for alleged breaches of the "best efforts" clauses of the License Agreements.

**II.  Addressing the Theories of Liability for Wright, AC, and Distributing**

In Motion 2 and Motion 4, Defendants Wright, AC, and Distributing contend that there is no basis for them to be liable to Plaintiff as to Claim 1 - "Breach of Agreements and Misrepresentations", Claim 2 - "Alter Ego Liability", or Claim 3 - "Piercing the Corporate Veil."

While there is disagreement over the identity of the licensee under the agreements, there is no dispute that neither

18

Wright, AC, nor Distributing actually signed the License

Agreements.   Accordingly, Plaintiff proposes numerous theories

for Wright's, AC's, and Distributing's culpability, alternatively

alleging that they are: A) liable as members of a joint venture

or for "dba" The Beverage Group; or B) liable under a promoter

liability theory; or C) liable as undisclosed principals,

partially disclosed principals, or agents of disclosed or

undisclosed principals; or D) liable as alter egos of TBG, Inc..

Defendants dispute each of these claims and argue that they have

no liability for any alleged breaches of the License Agreements

or misrepresentations.[9]

**A.   Joint Venture or "dba" Theories**

Plaintiff contends that "The Beverage Group" is a dba

fictitious name for Wright, or the name of a joint venture

between Wright, AC, and Distributing.[10]

---

[9] In order to succeed on their Summary Judgment motions, Defendants have argued that there is insufficient evidence of a misrepresentation.   The Court disagrees, concluding that Plaintiff has sufficiently alleged that Wright made a potentially actionable misrepresentation by traveling to Hawaii on November 4, 2004 where he allegedly affirmed his and the licensee's commitment to XTERRA.   Depending on the Court's ultimate finding regarding each Defendant's responsibility under the License Agreements, Defendants may be liable for alleged breaches of contract and/or alleged misrepresentations.

[10] Plaintiff alleges that Wright also may be liable under a "dba" theory.   However, Plaintiff offers no independent arguments or facts to support this contention apart from the allegations that he was also a member of a joint venture.   Thus, the allegation is subsumed into the discussion as to Wright's potential liability as one member of a joint venture.

"A joint venture is a mutual undertaking by two or more persons to carry out a single business enterprise for profit." Shinn v. Yee, 57 Haw. 215, 218 (Haw. 1976).  The rules governing a joint venture are similar to that of a partnership.  Id. at 217-18 (citing Kienitz v. Sager, 40 Haw. 1, 1953 WL 7541 at *4 (1953)).  There is a contractual relationship where each party agrees to make contributions, such as money, time, property, or effort, to the common undertaking.  Id. at 218.  It is critical that the agreement also contemplates the sharing of profits. Shinn, 57 Haw. at 218 (citing Winkelbach v. Honolulu Amusement Co., 20 Haw. 498, 1911 WL 1776 at *3 (1911)).  The terms of the agreement must be established with reasonable certainty.  Shinn, 57 Haw. at 218.  However, there is no requirement that a formal contract exists between the parties.  Id.  Rather, the contract may be express or implied and the existence of the joint venture may be established by direct or circumstantial evidence.  Id. (citing Kienitz, 40 Haw. 1, 1953 WL 7541 at *4).

Whether a joint venture exists is generally a question of fact.  Shinn, 57 Haw. at 219; Rogers v. M.O. Bitner Co., 738 P.2d 1029 (Utah 1987); Thompson v. Hiter, 826 N.E. 2d 503, 510 (Ill. App. Ct. 2005).  There is no evidence of an express contract forming a joint venture between any of the parties, so the Court must look to circumstantial evidence of an implied agreement.  Plaintiff alleges the following facts in support of

its contention that The Beverage Group was a joint venture:
Stephen Sparks signed the License Agreements some time between
December 21-23, 2002 as the President and CEO of The Beverage
Group, and before he was made an officer of TBG, Inc.; Wright
provided over $300,000 of his personal money to fund the
undertaking, negotiated with TEAM, and hired and supervised
consultants to develop the venture; initial payments pursuant to
the License Agreements to TEAM were made by AC after TBG, Inc.
was formed; and Distributing reimbursed Wright for some, but not
all, of his initial expenses and provided the funds to sustain
TBG, Inc. after its incorporation, including payments under the
License Agreements.

          In response to Plaintiff's allegations, Defendants
point to authority that parties may make an investment in a
start-up company without entering into a joint venture.  See Danq
v. F and S Land Development Corp., 62 Haw. 583, 590 (1980)
(finding that investors in a real estate project who were
promised a return of "twice their investments" were not joint
venturers).  However, in Danq, there was specific evidence
proving the plaintiffs did nothing more than contribute money
with an expectation of a certain return.  Here, there is no such
evidence of a limited participation on the part of any of the
Defendants.  In addition, at the April 9, 2006 hearing,
Defendants stated unequivocally that it is not their position

that Wright was making a personal investment in the business venture, despite incurring losses of over $70,000.

Defendants also argue that parties can take on separate, distinct roles in a venture without becoming joint venturers.  See Conor v. Great Western Sav. & Loan Ass'n, 447 P.2d 609, 615 (Cal. 1968) (the buyer and seller of the land and the buyer and seller of homes in a real estate development had distinct interests and were not joint venturers).  Again, here the roles of Wright, AC, Distributing, and TBG, Inc. are not so clearly defined at this time to establish definitively that they maintained similarly independent interests.

Defendants also suggest that undisputed facts rule out the possibility that The Beverage Group was a joint venture. First, Wright claims his sole purpose was to pursue a venture for Distributing, but Distributing did not completely reimburse him for the $300,000 he spent pursuing the deal, instead leaving him "out-of-pocket" almost $70,000.  Also, accepting Wright's explanation that he mistakenly declared The Beverage Group was the intended signatory, does not alter his assertion that TBG, Inc. and The Beverage Group are distinct entities.  At a minimum, Defendants concede The Beverage Group existed at one time. (Reply to Motion 4 at 6-7; see also Plaintiff's Opposition CSF, Ex. P (Wright May 27, 2005 Declaration) ¶ 8).

Wright now declares that neither he nor any of the

22

other Defendants ever were "doing business as" The Beverage Group, nor participated in a joint venture named The Beverage Group. (Motion 4 CSF, Wright Feb. 13, 2006 Declaration ¶¶ 20, 21). However, in Distributing's Reply to Motion 4, it admits that The Beverage Group existed independently of TBG, Inc.. According to Defendant, prior to the incorporation of TBG, Inc., The Beverage Group existed as a "promotion." (Reply to Motion 4 at 6-7). Distributing alleges, however, that once TBG, Inc. was incorporated, The Beverage Group ceased to exist. Distributing does not define "promotion" in this context nor does it clarify the relationships between the Defendants.

Considering Distributing's concession that TBG, Inc. and The Beverage Group are separate identities increases the significance of Sparks signing the License Agreements on behalf of The Beverage Group. Sparks knew that TBG, Inc. had been incorporated just days before he signed the agreements, but still signed the agreements for "The Beverage Group." Plaintiff also emphasizes that Sparks could not sign the License Agreements as President and CEO of TBG, Inc. between December 21-23, 2002, because he was not appointed President until January 7, 2003. (Plaintiff's Opposition CSF, Ex. T (Statement of Unanimous Consent Taken in Lieu of the First Meeting of the Board of Directors) at 1). Defendants' assertion that the omission of "Inc." was simply accidental is called further into question by

23

the fact that Sparks had no authority to bind TBG, Inc. at the time he signed the documents.

However, Defendants offer some evidence to support their claim that they never intended to create a joint venture. Sparks acknowledges that he was not yet President and CEO of TBG, Inc. when he signed the License Agreements, but believed he had the authority to do so at the direction of Wright.  (Motion 1 CSF, Ex. D (Sparks Deposition) at 82:15-83:23).  At the time he signed the documents, Sparks knew that Distributing had approved the venture and that TBG, Inc. had been formed as a Delaware corporation.  Sparks signed the License Agreements as President and CEO with The Beverage Group listed as the Licensee.  That is not the customary manner for an agreement to be signed on behalf of a joint venture, which would ordinarily include the names of the members of the venture and be signed by them.  The proximity of the incorporation date and the signature date do support Sparks' claim that he intended to sign the License Agreements on behalf of TBG, Inc. and not The Beverage Group.

Also, Wright has declared that all of his dealings with Sparks, Thornton, and Parsons concerned the creation of a subsidiary of Distributing.  (February 13, 2006 Wright Decl. ¶ 5; Motion 4 CSF, Parsons Deposition at 14:11-16).  He stated that they never discussed setting up a joint venture, nor did he do so with anyone from AC or Distributing.  (February 13, 2006 Wright

24

Decl. ¶ 5).   Whether or not a joint venture has been created

depends on the actual intention of the parties, which may be

established by their conduct.   Kienitz, 40 Haw. 1, 1953 WL 7541

at *4.

　　　　Even if the evidence supports a finding that a mutual

undertaking named The Beverage Group existed, Defendants assert

that The Beverage Group was never intended to be the licensee.

They argue that an error in draftsmanship should not expose them

to liability. Citing The Promotion Company, Inc. v. Sweeney, 782

N.E. 2d 117 (Ohio Ct. App. 2002).   In Promotion, a sponsorship

contract was signed by Sweeney, the President of State Chevrolet,

Inc., but the contract omitted "Inc." and referred simply to

"State Chevrolet" throughout the contract and at the signatory

line. Id. at 119.   The contract was prepared by the plaintiff who

later asserted Sweeney was dba State Chevrolet and the

corporation was not a party to the contract.   Id.   State

Chevrolet, Inc. was incorporated 54 years prior to the execution

of the contract, made all the payments pursuant to the agreement,

and "State Chevrolet" was a commonly used fictitious name for the

corporation, but never existed as an independent entity. Id. at

119-120.  As a result the court concluded, "[t]he omission of a

corporate name indicator in subsequent business dealings does not

extinguish the existence of a corporation and place personal

liability on the representative who signs a contract for the

company." Id. at 122.

Promotion is first distinguishable from the present case because the court's holding protected the signatory from liability, the equivalent of Sparks, who is not even a defendant here. Second, there was no proof that "State Chevrolet" existed; whereas here Defendants have admitted that The Beverage Group was an entity. In addition, State Chevrolet, Inc. had been in business for 54 years before the contract was signed, but TBG, Inc. was only formed days in advance. In Promotion, the court was certain that a drafting error was to blame for the plaintiff's attempt to expose the signatory to liability, but here it is not so obvious that a simple drafting error occurred.

Finally, Defendants assert that The Beverage Group can not be a joint venture because there is absolutely no evidence of a profit-sharing agreement. Wright has declared "[n]either I nor Distributing nor AC have ever been part of a joint venture called The Beverage Group, and have never shared or agreed to share profits in any such non-existent joint venture." (February 13, 2006 Wright Decl. ¶ 21).

"As with a partnership, it is absolutely essential that there be an agreement between the parties for a joint venture and that there be a provision in the contract for their sharing, as joint venturers, of the profits of the business." Shinn, 517 Haw. at 218 (citing Winkelbach, 20 Haw. 498, 1911 WL 1776 at *3

("[T]wo essential elements are present and indispensable in every partnership.  These are, first, a contract between the parties; and, second, this contract must be for the sharing as common owners of the profits of a lawful business.")); see also Kienitz, 40 Haw. 1, 1953 WL 7541 at *4 ("As a general rule, in order to constitute a joint venture, it is necessary that the parties agree to share losses as well as profits."); Dang, 62 Haw. at 590 (finding a lack of evidence that parties intended to create a joint venture and share its profits).

Plaintiff misses the significance of this element of a joint venture, taking the position that it "doesn't matter that the GROUP's members allegedly failed to realize any profit from their new venture." (Plaintiff's Opposition at 12).  It is true that a joint venture need not make money, but there must be an agreement outlining how that money will be shared in the event that the venture is profitable.  Here, there is not one scintilla of evidence of a profit-sharing agreement.  Also, as TBG, Inc. was never profitable, there is no trail of profits from which the Court could infer such an agreement existed.

In sum, there is no direct evidence of a joint venture agreement or an intent to share profits.  While there is some indicia of a joint venture, there is no evidence of an agreement to share profits.  Distributing may have a financial interest in TBG, Inc. as its parent company, but there is no evidence of any

agreement to share any profits with Wright or AC.  Furthermore,
the Court has not discovered any precedent suggesting that a
parent company's stake in a subsidiary is sufficient evidence of
a profit-sharing agreement to support a joint venture claim.  In
rare instances, courts have considered the possibility that
parent companies and subsidiaries are members of the same joint
venture, but Plaintiff does not allege that Distributing and TBG,
Inc. formed a joint venture.  See Kissun v. Humana, Inc., 479
S.E.2d 751, 754 (Ga. 1997) (holding that in the absence of alter
ego liability, a parent may still be liable for the acts of a
subsidiary under agency or joint venture liability); cf. Gruca v.
Alpha Therapeutic Corp., 19 F. Supp. 2d 862, (N.D. Ill. 1998)
(holding that there was insufficient evidence to support a claim
that a parent and subsidiary engaged in a joint venture).

        In the absence of any evidence of a profit-sharing
agreement, the Court concludes that Wright, AC, and Distributing
were not members of a joint venture named The Beverage Group nor
is there evidence of any other joint venture.  The Court grants
Defendants' Motions for Summary Judgment as they relate to
Plaintiff's theory of joint venture liability.

**B.   Promoter Liability Theory**

        Alternatively, Plaintiff alleges that Wright, AC, and
Distributing are liable as promoters for the subsequent breaches
of the License Agreements and misrepresentations.  Distributing

28

has conceded that The Beverage Group was a promotion. (Reply to Motion 4 at 6-7).

TBG, Inc. was incorporated in Delaware on December 20, 2002. The License Agreements were signed by Sparks, on behalf of either The Beverage Group or TBG, Inc., some time between December 21-23, 2002. The agreements were then signed by Kiely some time between January 12-15, 2003. The agreements both have an effective date of October 1, 2002.

Generally, promoters are liable for contracts they make on behalf of a corporation they intend to organize. Madeja v. Olympic Packer, LLC, 155 F. Supp. 2d 1183, 1204 (D. Haw. 2001). While Distributing has acknowledged the existence of a "promotion," Defendants assert that "there is no promoter liability if, at the time the contract is executed, a corporation already exists." 1A William Meade Fletcher, et al., Fletcher Cyclopedia of the Law of Private Corporations § 215, p. 461 (2002) (citing Almac, Inc. v. JRH Development, Inc., 391 N.W.2d 919, 924 (Minn. Ct. App. 1986)); Victory Lake Marine, Inc. v. Veldius, 621 N.W.2d 306, 311 (Neb. Ct. App. 2000); MacDonald v. Arrowhead Hot Springs Co., 300 P. 105, 107 (Cal. Dist. Ct. App. 1931). Thus, Defendants argue they cannot be liable as promoters because the Licence Agreements were signed after December 20,

2002, the date of incorporation of TBG, Inc..[11/]  Furthermore, TBG, Inc. performed under the License Agreements and satisfied the licensee's financial obligations, remitting checks from its bank account to TEAM, from early 2003 until July 2004, without any objection from TEAM.

Therefore, allegations that Defendants are liable as promoters of TBG, Inc. must be based on conduct that took place before TBG, Inc. was formed.  All of TEAM's claims against Defendants stem from conduct that occurred after December 20, 2002.  For these reasons, the Court concludes Wright, AC, and Distributing are not liable as promoters of TBG, Inc..

However, Wright, AC, and Distributing, as alleged participants in the promotion named The Beverage Group, may be liable as promoters of an entity other than TBG, Inc.; namely, The Beverage Group, which has never been incorporated. Generally, a promoter is not liable for a contract signed after a beneficiary corporation is formed because the newly-formed corporation is the signatory.  See Almac, 391 N.W.2d at 924. Thus, the third party is aware of the newly-formed corporation's

---

[11/]  Plaintiff originally argued that because the agreements are effective October 1, 2002, the promoter liability rule should be based on the date the agreement became effective, not the date it was later signed.  An agreement that is entered into "as of" an earlier date than the execution date is effective on that earlier date.  American Cyanamid Co. v. Ring, 286 S.E. 2d 1, 3 (Ga. 1982).  The Court concludes, as Plaintiff conceded at the April 10, 2006 hearing, that promoter liability is determined by the execution date, not the effective date.

existence and knows that the newly-formed corporation is liable. Victory Lake Marine, 621 N.W.2d at 311; MacDonald, 300 P. at 107. Here, Plaintiff claims it was not aware of TBG, Inc.'s existence at the time it signed the License Agreements and could not have believed that TBG, Inc. was obligated under the License Agreements.  This allegation renders Defendants' argument that TBG, Inc. already existed irrelevant.  There is a genuine issue of material fact as to whether TEAM was aware of TBG, Inc. at the time the agreements were executed.  See discussion infra Part II.C.2.

On the other hand, Plaintiff knew of The Beverage Group on the execution date, and since The Beverage Group has never been incorporated, any promoter liability as it pertains to the Group continues to exist.  Based on Plaintiff's allegations, it would be reasonable for it to have assumed that the signatory, The Beverage Group, was liable under the agreements.  The Beverage Group could be liable either directly as the licensee or as a promotion.

Therefore, Defendants Wright, AC, and Distributing may be liable as promoters of The Beverage Group and are not relieved of this duty notwithstanding TBG, Inc. was incorporated prior to the execution date.  Also, a promoter may not escape liability by assigning its rights and obligations to another.  Cf. Marconi's Wireless Tel. Co. v. Cross, 16 Haw. 390, 1905 WL 1329, *3 (1905)

(holding that "when a promoter binds himself by a contract, the subsequent adoption or assumption of the contract by the corporation, when organized, will not relieve him from liability . . . unless the other party consents . . . ."). Furthermore, the express terms of the License Agreements forbid assignment of the licensee's responsibilities without TEAM's prior written consent.  (Motion 1 CSF, Exs. J & K (License Agreements) at 9).

In summary, The Beverage Group existed as a promotion. There are genuine issues of material fact as to whether Wright, AC, and Distributing are promoters of The Beverage Group and whether TEAM knew that TBG, Inc. existed when TEAM executed the License Agreements.  The Court concludes that the alleged promoters of The Beverage Group may have continuing liability as such because The Beverage Group has never been incorporated.  For these reasons, the Court denies Defendants' Motions for Summary Judgment as they relate to Plaintiff's theory of promoter liability.

## C.   Principal/Agent Liability Theories

Plaintiff alleges that Defendants are liable under three principal/agency theories: 1) Defendants Wright, AC, and Distributing were undisclosed principals or partially disclosed principals; 2) Defendants Wright, AC, and Distributing were agents of an undisclosed principal (TBG, Inc.); and 3) Wright was an agent of Distributing.  However, before addressing the merits

32

of each theory, the Court considers Defendants' contention that these theories were improperly raised for the first time in Plaintiff's Opposition to Summary Judgment.

Federal Rule of Civil Procedure 8(a) states in pertinent part: "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a).  Plaintiff did allege that Wright acted as an agent for Distributing.  Plaintiff did not specifically allege that any of the Defendants were undisclosed principals, partially disclosed principals, or agents of an undisclosed principal (TBG, Inc.).  However, Plaintiff alleged that Defendants Wright, AC, and Distributing were liable for breaching the License Agreements and making misrepresentations under numerous alternative theories such as joint venturer liability, promoter liability, and/or alter ego liability.  Complaint ¶¶ 9, 31, and 34.  Moreover, a claim based on agent/undisclosed principal liability is similar to a claim based on promoter liability where the corporation has not yet been formed.  Promotion, 782 N.E. 2d at 123.

Plaintiff is not introducing new facts or adding new claims, but it is offering a new theory under which these Defendants may be liable for the allegations made in Count 1. Furthermore, under the federal liberal pleading standards, a court should consider theories supported by alleged facts even if

33

they are not explicitly pled as long as the defendants have

notice of the issues in the case.  Pruitt v. Cheney, 963 F.2d

1160, 1164 (9th Cir. 1991) (quoting Electrical Constr. & Maint.

Co. v. Maeda Pacific Corp., 764 F.2d 619, 622 (9th Cir. 1985));

see also American Timber & Trading Co. v. First National Bank,

690 F.2d 781, 786 (9th Cir. 1982); Cf 5A C. Wright & A. Miller,

Federal Practice and Procedure § 1357, at 676 (2004) ("The

complaint should not be dismissed merely because plaintiff's

allegations do not support the legal theory he intends to proceed

on, since the court is under a duty to examine the complaint to

determine if the allegations provide for relief on any possible

theory.").

Therefore, the Court concludes that Plaintiff's

additional principal/agent liability theories, to the extent that

they are based on facts alleged in the Complaint or issues made

known to Defendants, may be considered in opposition to Motion 2

and Motion 4.

    1.   Undisclosed or Partially Disclosed Principals

Defendants Wright, AC, and Distributing cannot be

undisclosed or partially disclosed principals.[12/]  It is clear

---

   [12/]  "If the other party has notice that the agent is or may
be acting for a principal but has no notice of the principal's
identity, the principal for whom the agent is acting is a
partially disclosed principal."  Restatement (Second) of Agency §
4(2).  "If the other party has no notice that the agent is acting
for a principal, the one for whom he acts is an undisclosed
principal." Restatement (Second) of Agency § 4(3).

that TEAM knew of Wright's, AC's, and Distributing's existence before the License Agreements were signed.  Kiely has testified that he did not focus on the actual identity of the licensee or whether it would even be a corporation.  (Motion 4 CSF, Ex. 5 (Kiely's Deposition) at 63:12-65:10).  However, he met personally with Wright, who he knew to be the CEO of Distributing, and AC was listed on three drafts of the License Agreements.  The Court concludes that neither Wright, AC, nor Distributing may be liable as undisclosed principals or partially disclosed principals.

   2.   <u>Agents of Undisclosed Principal (TBG, Inc.)</u>

      "An agent purporting to act upon his own account, but in fact making a contract on account of an undisclosed principal, is a party to the contract."  Restatement (Second) Agency § 322 (1958).[13/]

      Distributing claims TBG, Inc. was not an undisclosed principal because Kiely knew of TBG, Inc.'s existence when he signed the License Agreements. (Motion 4 CSF at 18).  In a

---

[13/]  Defendants challenge any liability under agency theory by citing <u>Promotion</u>, where the court concluded that the omission of "Inc." did not make the principal undisclosed.  782 N.E.2d at 123-24.  However, the court's ruling was based in part on the fact that the alleged undisclosed principal had a fifty-four year history and was described by its well-known fictitious name in the agreement.  Here, TBG, Inc. was incorporated only a few weeks prior to Kiely's endorsement of the License Agreements and The Beverage Group was not a well-known name for TBG, Inc., but rather an independent entity.  For reasons to be discussed, it remains a question of fact as to whether the identity of TBG, Inc. was disclosed.

February 22, 2005 email to Wright,[14/] Kiely stated "as you know, TBG, Inc. was not formed until December 2002." (Motion 4 CSF, Deposition Exhibit 64). The email proves that Kiely knew about TBG, Inc. in February 2005, but not necessarily that he was aware of TBG, Inc.'s existence in January 2003.[15/] Plaintiff disputes that it had any knowledge of TBG, Inc. at the time it signed the Agreements, referring to TBG, Inc. as "the purported principal whose existence was never revealed to TEAM." (Plaintiff's Opposition at 16). Kiely testified that he was not informed by Thornton that Distributing was forming a new subsidiary called TBG, Inc. and that he did not focus on the identity of the licensee. (Motion 4 CSF, (Kiely Deposition) at 64:13-65:10). The Court concludes that whether TEAM was aware of TBG, Inc. when Kiely signed the agreements is a disputed question of fact.

As discussed previously, Plaintiff has presented sufficient factual allegations to suggest Wright, AC, and Distributing played a role in forming a contractual relationship with TEAM. There is no doubt that Wright, AC, Distributing, and The Beverage Group were fully disclosed to TEAM. It is a

---

[14/] This is the email in which Kiely misstated the time when the License Agreements were signed that allegedly led to Wright's subsequent confusion about the identity of the licensee. The stated purpose of the email was to encourage Wright to make a settlement offer.

[15/]Distributing's additional citation to page 83 of Kiely's deposition in support of the claim that Kiely was aware of TBG, Inc.'s existence in January 2003 is not included in the record.

disputed whether TEAM knew of TBG, Inc. at the time the agreements were signed.  If Defendants intended to enter into the contracts with TEAM on behalf of TBG, Inc., but TEAM did not know that TBG, Inc. existed, then Defendants may be liable as agents of an undisclosed principal.  Thus, the Court concludes that Plaintiff's theory that Defendants may be liable as agents of an undisclosed principal remains viable, and denies Defendants' Motions for Summary Judgment as they pertain to this theory.

     3.  <u>Wright as an Agent of Distributing</u>

     Finally, Plaintiff alleges that Wright may be liable as an agent for Distributing.  "An agent, by making a contract only on behalf of a competent disclosed or partially disclosed principal whom he has power so to bind, does not thereby become liable for its nonperformance."  Restatement (Second) of Agency § 328 (1958).  As stated, Distributing was disclosed to TEAM.  Therefore, even if Wright acted as an agent of Distributing, and it is later determined that Distributing is a party to the agreements, Wright is not liable to TEAM for performing that role.

     For the foregoing reasons, the Court concludes that Wright, AC, and Distributing are not liable as undisclosed principals or partially disclosed principals; genuine issues of material fact exist regarding whether Wright, AC, and Distributing are liable as agents of an undisclosed principal

37

(TBG, Inc.); and Wright is not liable as an agent of Distributing.

**D.   Alter Ego Theory**

Plaintiff has also argued that the Court should pierce TBG, Inc.'s corporate veil to find Wright, AC, and Distributing liable as alter egos of TBG, Inc..[16]  In diversity actions, federal courts apply state law when evaluating a claim for alter ego liability.  Hambleton Bros. Lumber Co. v. Balkin Enterprises, 397 F.3d 1217, 1227 (9th Cir. 2005); Firstmark Capital Corp. v. Hempel Financial Corp., 859 F.2d 92, 95 (9th Cir. 1988).  This action was brought under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and the contract, by its own terms, is to be resolved according to Hawaii law.[17]  "Courts apply the alter ego doctrine with great caution and reluctance."  Robert's Hawaii

---

[16]The Court recognizes that "alter ego" liability and "piercing the corporate veil" are similar theories and are often used interchangeably.  The Hawaii Supreme Court has expressed the theories in this way: "[a] claim based on an alter ego theory is not itself a claim for substantive relief, but rather to disregard the corporation as a distinct defendant is procedural....  An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action."  Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transportation, 91 Haw. 224, 241; 982 P.2d 853, 870 (Haw. 1999).

[17]Defendants' reliance on federal substantive law is improperly derived from cases where the underlying claims were based on federal law, such as the Labor Management Relations Act, Seymour v. Hull & Moreland Engineering, 605 F.2d 1105, 1111 (9th Cir. 1979), or the Employee Retirement Income Security Act, Board of Trustees v. Valley Cabinet & Manufacturing Co., 877 F.2d 769, 772 (9th Cir. 1989).

School Bus, Inc. v. Laupahoehoe Transportation, 91 Haw. 224, 241

(1999); Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d

Cir. 2001), cert. denied 534 U.S. 950, 122 (2001).

In Hawaii, a corporation may be the alter ego of

another "where recognition of the corporate fiction would bring

about injustice and inequity or when there is evidence that the

corporate fiction has been used to perpetrate a fraud or defeat a

rightful claim." Robert's Hawaii, 91 Haw. at 241-42 (quoting

Chung v. Animal Clinic, Inc., 63 Haw. 642, 645 (1981)); see also

Kahili, Inc. v. Yamamoto, 54 Haw. 267, 271-72 (1973).  Generally,

the question of whether a corporation is an alter ego of another

is a question of fact.  Robert's Hawaii, 91 Haw. at 238 (citing

Fletcher, 1 Cyclopedia of the Law of Private Corporations §

41.95, at 699-705 (1999)).  When no genuine material issues of

fact exist, a court may determine alter ego liability as a matter

of law, but an alter ego allegation "ordinarily should not be

disposed of by summary judgment, in view of the complex economic

questions often involved, especially if fraud is alleged."

Robert's Hawaii, 91 Haw. at 238-39 (quoting Fletcher Cyclopedia,

at 699-700).

In Robert's Hawaii, the court listed numerous factors

to consider in evaluating alter ego liability.  There is no one

determinative factor.  The most relevant factors to the case at

hand include: 1) commingling or failing to separate funds; 2)

"the failure to adequately capitalize a corporation"; 3) "the total absence of corporate assets, and undercapitalization"; 4) "the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation"; 5) "the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest"; 6) "the disregard of legal formalities and the failure to maintain arm's length relationships among the related entities"; 7) "the formation and use of a corporation to transfer to it the existing liability of another person or entity"; 8) "whether the subsidiary has no business or assets except those conveyed to it by the parent"; and 9) the parent's financing of the subsidiary.  <u>Robert's Hawaii</u>, 91 Haw. at 242.

The Court has preliminarily addressed the potential alter ego liability of Distributing, <u>see</u> September 29, 2005 Order at 29 n. 12, and that of Wright and AC, <u>see</u> January 18, 2006 Order at 29-35, as alternate grounds for finding personal jurisdiction.  The Court concluded that Plaintiff had alleged numerous facts consistent with the Hawaii factors to support a finding of personal jurisdiction on alter ego grounds and that many determinations of fact were unresolved.  While the Court recognizes that the standard for personal jurisdiction under an alter ego theory is lower than the standard for liability under an alter ego theory, <u>San Mateo County Transit District v.</u>

Fitzgerald, 979 F.2d 1356, 1358 (9th Cir. 1992), multiple genuine issues of material fact remain as to the extent of the overlap between the conduct and identity of the Defendants.

Viewing the factual record in a light most favorable to Plaintiff, the following facts support a finding that Defendants are an alter ego of TBG, Inc.: Wright personally fronted $300,000 for the development of the beverage venture to keep the transactions off of Distributing's records; Wright was not reimbursed for over $70,000 of these expenses, despite Defendants' assertion that it was their sole intention to create a subsidiary of Distributing to be the licensee; AC was listed as the licensee in early drafts of the License Agreements; AC is described as a zero-balance account, but AC owns a beverage company in Nebraska; AC made the first four payments pursuant to the License Agreement after TBG, Inc. was formed; Wright was the initial sole Officer and Director of TBG, Inc.; TBG, Inc. received all of its financial support to the tune of $11.6 million directly from Distributing in the form of interest-bearing loans; no promissory notes were created; TBG, Inc. never made any payments of principal or interest to Distributing on the loans; Distributing transferred funds to TBG, Inc. whenever it needed to satisfy its financial obligations;[18/] when Distributing

_____

[18/]   Wright stated, "I believe the way The Beverage Group, Inc. operated, you could say that anything they paid out

**(cont.)**

41

decided to cease financial support, TBG, Inc. then failed to meet its contractual obligation; as a new start-up company, TBG, Inc. held board of directors meetings and/or adopted statements of unanimous consent only "at least annually" (Motion 4 CSF, Wright Declaration ¶ 12).

Defendants proffered the following relevant evidence to counter allegations of conduct that is consistent with alter ego liability: TBG, Inc. developed and/or promoted several other beverage lines; Wright, Sparks, Thornton, and Parsons operated with the understanding that they were creating a subsidiary of Distributing; TBG, Inc. paid TEAM approximately $388,000 under the License Agreements; TBG, Inc. has its own corporate offices in Pasadena, CA; Defendants did not use funds from the account of TBG, Inc.; Distributing and TBG, Inc. maintained separate bank accounts; Distributing made cash contributions to TBG, Inc. of $11.6 million as "intercompany long term debt"; Distributing and TBG, Inc. recorded the loans between the companies in both of their financial records; Wright was the only common Director of TBG, Inc. and Distributing until May 2004 and the only common Officer until December 2003.

---

ultimately came pursuant to a request to Amcon Distributing to fund it, including the X[TERRA] royalties." (Motion CSF 1, Ex. C (Wright Deposition) at 221:19-25). This portrayal of TBG, Inc.'s financial identity parallels that of AC, as they appear to be mere conduits or "zero-balance" accounts, relying completely on the contributions of others to make payments, and not maintaining a balance on their own.

At the summary judgment stage the Court must consider all evidence and inferences therefrom in the light most favorable to Plaintiff as the nonmoving party. Plaintiff's version of the facts raises material issues of fact that Defendants may have been alter egos of TBG, Inc.. Acknowledging the reluctance of Hawaii courts to make determinations regarding alter ego liability at the summary judgment stage, the Court concludes that Defendants have not met their burden at summary judgment. The Court denies Defendants' Motions for Summary Judgment as they pertain to Plaintiff's alter ego and piercing the corporate veil theories of liability.

III. **Distributing's Liability with Respect to Count 1**

In Motion 1, Plaintiff seeks Partial Summary Judgment against Distributing on Claim 1 - "Breach of Agreements and Misrepresentations." In summary, Plaintiff alleges that Distributing is a member of the joint venture "The Beverage Group" and as such, it is liable for breaches and misrepresentations of the Group. Interestingly, Plaintiff does not move for summary judgment on this claim against any other Defendant, despite Plaintiff's contention in its Opposition that Wright and AC are also members of the Group.

As the Court explained regarding Defendants' Motion 2 and Motion 4, the Court does not find evidence of a joint venture, but genuine issues of material fact still exist that

43

make a final determination regarding the roles and liabilities of the Defendants improper at this stage of the proceedings.  <u>See</u> discussion <u>supra</u> Part II.A-D.  For example, Plaintiff contends that the License Agreements are clear on their face that The Beverage Group is the licensee, while Distributing alleges that Plaintiff knew that the licensee was TBG, Inc., a subsidiary of Distributing.  To further complicate matters, Kiely admitted in his deposition that he did not give much thought to the actual identity of the licensee.  Finally, in the numerous drafts of the License Agreements, three distinct entities were listed as the licensee.

The Court concludes that genuine issues of material fact remain regarding Distributing's role in The Beverage Group, and whether it is liable as a result.  Therefore any determination as to the liability of Distributing for alleged breaches of contract and misrepresentations would be premature at this time.  The Court denies Plaintiff's Motion for Partial Summary Judgment.

<u>CONCLUSION</u>

For the foregoing reasons, the Court: (1) DENIES Plaintiff's Motion for Partial Summary Judgment; (2) DENIES in part Defendants William F. Wright's and AMCON Corporation's Motion for Summary Judgment as it relates to promoter liability, alter ego liability, piercing the corporate veil, and liability

44

as an agent of an undisclosed principal, but GRANTS in part the

Motion for Summary Judgment as it relates to theories of joint

venture liability, undisclosed or partially disclosed principal

liability, and agent of a disclosed principal liability; (3)

DENIES Defendant The Beverage Group, Inc.'s Motion for Partial

Summary Judgment; and (4) DENIES in part Defendant AMCON

Distributing Company's Motion for Summary Judgment as it relates

to promoter liability, alter ego liability, piercing the

corporate veil, and liability as an agent of an undisclosed

principal, but GRANTS in part the Motion for Summary Judgment as

it relates to theories of joint venture liability, and

undisclosed or partially disclosed principal liability.


IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 25, 2006.




_____
Alan C. Kay
Sr. United States District Judge


TELEVISION EVENTS & MARKETING, INC. V. AMCON DISTRIBUTING CO., ET AL., CIV. NO. 05-00259 ACK/KSC, ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS WILLIAM F. WRIGHT'S AND AMCON CORPORATION'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT THE BEVERAGE GROUP, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANT AMCON DISTRIBUTING COMPANY'S MOTION FOR SUMMARY JUDGMENT.