IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TELEVISION EVENTS & MARKETING, INC., a Hawaii Corporation, | ) ) ) | Civ. No. 05-00259 ACK/KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMCON DISTRIBUTING CO., a Delaware Corporation; THE BEVERAGE GROUP, INC., a Delaware Corporation; THE BEVERAGE GROUP aka AMCON BEVERAGE COMPANY; AMCON CORPORATION, a Delaware Corporation; and WILLIAM F. WRIGHT, | ) ) ) ) ) ) ) ) ) ) | ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT AND COUNTERCLAIM |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| AMCON DISTRIBUTING CO., a Delaware Corporation; and THE BEVERAGE GROUP, INC., a Delaware Corporation, | ) ) ) ) | |
| | ) | |
| Counter Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TELEVISION EVENTS & MARKETING, INC., a Hawaii Corporation; ARCHIE J. THORNTON; and THE THORNTON WORKS, INC., a California Corporation, | ) ) ) ) ) ) | |
| | ) | |
| Counter Defendants. | ) | |
| _____ | ) | |

1

## ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT AND COUNTERCLAIM

### PROCEDURAL BACKGROUND

Television Events & Marketing, Inc. ("Plaintiff" or "TEAM") allege that the following Defendants are liable for the breach of two License Agreements and for misrepresentations: (1) AMCON Distributing Company ("Distributing"); (2) The Beverage Group, Inc. ("TBG, Inc."); (3) The Beverage Group ("Group"); (4) William F. Wright ("Wright"); and (5) AMCON Corporation ("AC")(collectively, "Defendants").

On July 5, 2006, Distributing and TBG, Inc. ("Counter Claimants") filed an Amended Answer to the Second Amended Complaint along with a Counterclaim against TEAM, Archie J. Thornton ("Thornton"); and The Thornton Works, Inc. ("Thornton Works") (collectively, "Counter Defendants"). The Counterclaim alleges the following: (1) Thornton breached his fiduciary duty; (2) TEAM tortiously assisted Thornton in breaching his fiduciary duty; (3) unjust enrichment/restitution; (4) TEAM breached its duty of good faith and fair dealing; (5) TEAM and Thornton's failure to disclose Thornton's agency relationship with TEAM constituted fraud and misrepresentation; and (6) punitive damages.[1]

---

[1]   In the Order of September 12, 2006, the Court dismissed Count VI, punitive damages, as an independent claim.  Counter

The Court has issued the following four substantive written Orders in this case:

> (1) Order Denying Distributing's Motion To Dismiss for Lack of Personal Jurisdiction; Granting Defendants' Request to Amend their Motion to Dismiss and for Summary Judgment and to Transfer Venue; Denying Defendants Distributing and TBG, Inc.'s Motion for Summary Judgment as to Plaintiff's First Claim for Relief and Not Addressing the Motion as to Group, Wright, nor AC; Denying Defendants Distributing and TBG, Inc.'s Motion for Summary Judgment as to the Plaintiff's Second Claim for Relief and Not Addressing the Motion as to Wright; and Denying Defendants' Motion To Transfer Venue (hereafter "September 29, 2005 Order");

> (2) Order Denying AC and Wright's Motion to Dismiss for Lack of Personal Jurisdiction; Denying AC and Wright's Motion to Transfer for Lack of Personal Jurisdiction or Improper Venue; and Denying AC and Wright's Motion to Transfer for Convenience (hereafter "January 18, 2006 Order"); and

> (3) Order Denying Plaintiff's Motion For Partial Summary Judgment; Granting in Part and Denying in Part Defendants AC and Wright's Motion for Summary Judgment; Denying Defendant TBG, Inc.'s Motion for Partial Summary Judgment; and Granting in Part and Denying in Part Defendant Distributing's Motion for Summary Judgment (hereafter "April 25, 2006 Order").

> (4) Order Granting in Part and Denying in Part Counter Defendants' Motion to Dismiss Counterclaim (hereafter "September 12, 2006 Order").

On November 27, 2006, Defendants and Counter Claimants Distributing and TBG, Inc. filed a Motion for Summary Judgment on

---

Claimants are, however, allowed to request punitive damages as part of their prayer for relief.

the Second Amended Complaint and Counterclaim[2] ("Distributing &
TBG, Inc. Motion") and a Concise Statement of Facts
("Distributing/TBG, Inc. CSF").  The same day, Defendants Wright
and AC filed a Motion for Summary Judgment on the Second Amended
Complaint ("Wright/AC Motion") and a Concise Statement of Facts
("Wright/AC CSF").

On March 13, 2007, TEAM filed an Opposition to
Distributing/TBG, Inc. and Wright/AC's Motions for Summary
Judgment ("TEAM Opp.") as well as a Concise Statement of Facts
("TEAM CSF").[3]

On March 15, 2007, Thornton and Thornton Works filed an
Opposition to the Distributing/TBG, Inc. Motion ("Thornton Opp.")
and a Concise Statement of Facts ("Thornton CSF").

On April 2, 2007, Distributing and TBG, Inc. filed a
Reply ("Distributing/TBG, Inc. Reply"), and Wright and AC also
filed a Reply ("Wright/AC Reply").

A hearing on Defendants' and Counter Claimants' Motions

---

[2] On January 4, 2007, more than a month after filing their
Motion for Summary Judgment on the Second Amended Complaint and
Counterclaim, Defendants Distributing and TBG, Inc. filed an
Amended Counterclaim, adding Counter Defendant Tom Kiely. The
Court is limited, however, to considering the original
Counterclaim on which the Motion was filed; the substantive
result would not appear to differ were the Court to consider the
Amended Counterclaim instead.

[3] TEAM and Tom Kiely submitted the Opposition, but because
the Court is limited to considering the Counterclaim rather than
the Amended Counterclaim, the Opposition and its concise
statement of facts is deemed to be submitted solely by TEAM.

was held on Wednesday, May 16, 2007 at 10:00 a.m..

## FACTUAL BACKGROUND[4]

The Court presented the facts that gave rise to the Complaint and Counterclaim in great detail in the four preceding orders.  The following factual allegations are pertinent to the instant Motions for Summary Judgment.

Since the Court's April 25, 2006 ruling on the parties' previous motions for summary judgment, Defendants obtained documents they allege demonstrate that during the negotiation of the License Agreements in the fall of 2002 and at the time Kiely signed the License Agreements for TEAM on or around January 15, 2003, Thornton was an undisclosed dual agent of both TEAM and Distributing/TBG, Inc.  Namely, Defendants point to a check dated May 27, 2003 from TEAM payable to Thornton for $25,000. Plaintiff and Counter-Defendants dispute the allegation that Thornton was an undisclosed dual agent.[5]

---

[4] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

[5] For the purposes of clarity, the Court notes the following individuals' roles in the instant case: Tom Kiely is the CEO of TEAM; Archie Thornton owns and heads a marketing company, Thornton Works, Inc., and allegedly worked for both the Defendants and the Plaintiff; William Wright is the Chairman and CEO of Distributing; Stephen Sparks and Richard Parsons were hired (along with Thornton) by Wright to develop and operate the Licensee.  Sparks became CEO of TBG, Inc., and Parsons became the Chairman of the Board, Thornton became a director.

In May of 1997, TEAM executed a Letter Agreement contracting with Thornton to be TEAM's sales representative to negotiate and secure licensing agreements for TEAM's various events and logos, including the XTERRA brand. See Distributing/TBG, Inc. CSF Exh. "10." The agreement provided that "Archie Thornton will carry a TEAM Unlimited business card, and the title will be Vice President." Id. Under the agreement, Thornton would be compensated via commission set at 25% of net revenue for business generated for TEAM and monthly advances on commission of $1,000. The agreement provided for cancellation by 30 day written notice, and amendment of the agreement needed to be in writing. Id. Counter Defendants admit the existence of the May 13, 1997 agreement, but argue that Thornton was never an employee of TEAM and that the contractual relationship with Thornton was effectively terminated upon mutual agreement after September 28, 1998 when TEAM ceased paying $1000 monthly advances to Thornton. See TEAM Opp. at p. 6; Thornton 3/15/07 Decl. at ¶ 8. Thornton states that he was not retained by TEAM to perform any services between September 28, 1998 and April 21, 2003[6] and did not receive any money from TEAM between September 1, 1999 and May 27, 2003. See Thornton 3/15/07 Decl. at ¶¶ 10-12, 16. Counter Defendants argue that after September 28, 1998, Thornton

---

[6] On April 21, 2003, Thornton and TEAM executed a Letter Agreement under which he would attempt, on a non-exclusive basis, to find a buyer for TEAM. See Thornton Decl. at ¶ 12.

6

was paid final commissions on several transactions in which he had acted as a finder during the term of the 1997 agreement.  Id. at ¶¶ 9-11.  Counter Claimants point out that neither TEAM nor Thornton present any evidence of a written notification terminating their May 1997 agreement, and thus argue the agreement continued to be in effect through May, 2003.  See Distributing/TBG, Inc. Reply at pp. 3-4. Counter Claimants also point to a document dated May 26, 2006 that appears to list Thornton as Director of Licensing and Sponsorship Sales for TEAM. See Distributing/TBG, Inc. CSF, Exh. "11."

In the fall of 2001, Thornton was retained by Distributing to conduct due diligence relating to its planned acquisition of Hawaiian Natural Water Co. See Thornton 3/15/07 Decl. at ¶ 13; TEAM CSF at ¶ 3. In or around late 2001, Thornton learned from Kiely that the existing licensee for the XTERRA trademark, Tom Moody, was having financial difficulties and was seeking new investors or partners.  See TEAM Addit. CSF at ¶ 6. Thornton introduced Wright to Moody, but the discussions were unsuccessful.  Id. at ¶ 8.  Thornton claims that when he introduced Wright and Moody, this was done by his own initiative, not at the request of TEAM, and that he did not expect any compensation for the introduction from anyone.  See Thornton 3/15/07 Decl. at ¶ 14. Thornton states that he then introduced Wright and Kiely to explore the possibility of licensing the

XTERRA mark and did not have an expectation that he would be compensated by TEAM or anyone else for the introduction.  <u>See</u> Thornton 3/15/07 Decl. at ¶ 14.

Counter Defendants argue that at all relevant times, Wright knew that Thornton had worked with TEAM in the late 1990s to find licensees for the XTERRA brand. <u>See</u> TEAM CSF ¶ 5; Exh. "13" Wright Depo. at pp. 19-20. In the late 1990s, Wright states that he and Thornton were friends and acknowledges leasing Thornton office space when Thornton was working for TEAM on XTERRA licensing. <u>Id.</u> at p. 17. Wright's son worked for Thornton on XTERRA matters during that time, and Wright acknowledges that he assumed Thornton was being paid for his work for TEAM.  <u>Id.</u> Wright testifies in his deposition that he assumed Thornton was working for Kiely "to this day" due to their friendship.  <u>See</u> TEAM CSF, Exh. "13" at p. 19.  In addition to his longstanding relationship with Kiely and TEAM, Thornton avers that he is and has been a significant shareholder in Distributing for a number of years with investments amounting to approximately $40,000. <u>See</u> Distributing/TBG, Inc. CSF Exh. "4", Thornton Depo. at p. 21.

On February 18, 2002, Thornton, Wright, and Kiely met, at which meeting Kiely gave Wright an overview of TEAM's XTERRA business. <u>See</u> Kiely Decl. at ¶ 11.  Thornton then arranged a meeting between Kiely and Wright in July, 2002 to discuss the XTERRA brand. <u>See</u> Kiely Decl. at ¶¶ 13-14.  Thornton was present

8

for a portion of the meeting and facilitated communications, but asserts he did not engage in substantive discussion or negotiation of the terms of the License Agreements. See TEAM Additional CSF at ¶ 9.

In his deposition, Thornton acknowledges receiving draft licensing agreements from TEAM via email on or around September 30, 2002. See Distributing/TBG, Inc. CSF Exh. "4", Thornton Depo. at p. 101-102.  On October 15, 2002, Thornton's company, Thornton Works, Inc. was retained as a consultant to Amcon Beverage Company to assist with marketing and advertising.[7] See Distributing/TBG, Inc. CSF Exh. "2", Thornton 5/30/05 Decl. at ¶ 13; Exh. "4", Thornton Depo. at p. 22.  During the fall of 2002, Thornton sent his bills to Amcon Beverage Company.  Id. Kiely states in his deposition that he talked with Thornton about the licensing agreements "every couple of weeks . . . about what was happening on their side, their side being Amcon's and Bill Wright's side."  See Distributing/TBG, Inc. CSF Exh. "3", Kiely Depo at p. 37.

Thornton states that he participated in negotiations with TEAM to reduce Group's fee and payment schedule, but he did not participate in negotiations for the initial agreement between

_____

[7]   The Court notes that "Amcon Beverage Co." was a placeholder name for Distributing's new company planned to handle beverage operations. See Distributing/TBG, Inc. CSF Exh. "4", Thornton Depo. at p. 56.

9

Kiely, Sparks, and Wright.  See Distributing/TBG, Inc. CSF Exh. "4," Thornton Depo. at p. 30. In his deposition and declaration, however, Kiely states that he negotiated the terms of the licensing agreements in 2002 with Wright and Thornton. See Distributing/TBG, Inc. CSF Exh. "1", Kiely Decl. at ¶ 5, Exh. "3", Kiely Depo. at 174.  In September and October of 2002, Sparks shared draft licensing agreements with Thornton for Thornton to review and comment.  See Distributing/TBG, Inc. CSF, Exh. "4," Thornton Depo. at p. 91-92; Exh. "15", Sparks Depo. at p. 214-15. Thornton, Sparks, and Parsons met with Kiely sometime between October 20-27, 2002 concerning the negotiation and/or signing of the two license agreements.  See Distributing/TBG, Inc. CSF Exh. "4", Thornton Depo. at p. 80-81.

Thornton attended meetings with Wright and Sparks in September and October of 2002 where discussions were held about forming a new corporation as a wholly owned subsidiary of Distributing to handle the beverage operations.  See Distributing/TBG, Inc. CSF Exh. "4", Thornton Depo. at pp. 30-32, Depo Exhs. "1", "2".  In his deposition, Thornton was shown a document, labeled Depo. Exh. 2, dated September 16, 2002, that Thornton says was "circulated in a meeting in del Mar . . . to serve as a discussion point and a document of intent on what the company's goal, mission, role was going to be." Id. Thornton Depo. at p. 55.  The document states, "AMCON Distributing

Company, a publicly held company (DIT: AMEX), will organize and fund a new wholly-owned subsidiary.  The state of incorporation likely will be Delaware.  The name of the company is yet to be selected. . . . The new company can secure the exclusive worldwide agreement for the production and distribution of X-Terra® sports beverage and nutrition bars."  Id., Thornton Depo. Exh. 2 at p. W0003.  Thornton states that he worked with the advertising agency retained to come up with the name for the new entity, and that they ultimately decided upon "The Beverage Group, Inc.," which was to officially begin business January 1, 2003. Id., Thornton Depo. at p. 32.  In early December 2002, Thornton acknowledges attending a board meeting for Distributing at which a business plan to set up TBG, Inc. was presented for approval. Id. Thornton Depo. at pp. 83-84.  This business plan for TBG, Inc. states, "The Beverage Goup, Inc. is a new, wholly owned subsidiary of AMCON Distributing Company, a $900 million dollar publicly traded company [Amex-Symbol 'DIT']," and refers to the XTERRA product line as "our Xterra brand" and states, "we have entered into exclusive licensing agreements with Team Unlimited out of Honolulu, for the rights to the Xterra brand for a line of Sports Drink and Energy Bars." Id., Thornton Depo. Exh. 4 at pp. 6,8.  TBG, Inc. was incorporated in Delaware on December 20, 2002, but Thornton states he did not become aware of the incorporation until January or February of 2003 when he was asked

11

to design letterhead for the new company.  Id. at pp. 88-89.  On

December 27, 2002, Thornton submitted an invoice for payment to

"The Beverage Group, Inc." See Amcon/Wright Exh. "14". Thornton

became a director for TBG, Inc. on January 3, 2003. See

Thornton's Answer to Counterclaim filed 9/15/06 at ¶ 7.  Kiely

signed the license agreements on behalf of TEAM on or about

January 12-15, 2003, but the agreements were dated effective

October 1, 2002. See Distributing/TBG, Inc. CSF Exh. "3". Kiely

Depo. at pp. 74-75.  The License Agreements identified the

licensee as "The Beverage Group."  See TEAM CSF Exhs. "I", "M".

On April 21, 2003, Thornton was retained by TEAM by

Letter Agreement under which he attempted to find a buyer for

TEAM.  See Thornton Depo. 3/15/07 at ¶ 12.

About a month later, on May 27, 2003, TEAM paid

Thornton $25,000, noting on the check, "Re: Consulting &

Friendship," and "Commission - TBG, Hype & Hawn. Springs."  See

Distributing/TBG, Inc. CSF Exh. "10".  Counter Defendants

acknowledge that the payment was regarding the licensing

agreements between TEAM and The Beverage Group, but state that

the payment was made out of respect for Thornton's role in

introducing TEAM to Wright and due to his friendship with Kiely.

See Thornton CSF at ¶ 11; TEAM Addtl. CSF at ¶ 11. TEAM

characterizes the payment as voluntary, unilateral, and a

finder's fee. See TEAM Opp. at p. 10.

12

**STANDARD**

I.   **Motion for Summary Judgment**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation omitted).[8]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S.

---

[8]Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' International Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

574, 587 (1986) (citing <u>First National Bank of Arizona v. Cities</u>

<u>Service Co.</u>, 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court

as to the absence of a genuine issue of material fact.  <u>Celotex</u>,

477 U.S. at 323; <u>Miller v. Glenn Miller Productions</u>, 454 F.3d

975, 987 (9th Cir. 2006).  The moving party may do so with

affirmative evidence or by "'showing'--that is pointing out to

the district court--that there is an absence of evidence to

support the nonmoving party's case."  <u>Celotex</u>, 477 U.S. at 325.[9]

Once the moving party satisfies its burden, the

nonmoving party cannot simply rest on the pleadings or argue that

any disagreement or "metaphysical doubt" about a material issue

of fact precludes summary judgment.  <u>See</u> <u>Celotex</u>, 477 U.S. 323;

<u>Matsushita Elec.</u>, 475 U.S. at 586; <u>California Architecture</u>

<u>Building Products, Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d

1466, 1468 (9th Cir. 1987).[10]  The nonmoving party must instead

_____

[9]When the moving party bears the burden of proof at trial,
that party must satisfy its burden with respect to the motion for
summary judgment by coming forward with affirmative evidence that
would entitle it to a directed verdict if the evidence were to go
uncontroverted at trial.  <u>Miller</u>, 454 F.3d at 987 (quoting <u>C.A.R.
Transportation Brokerage Co. v. Darden Restaurants, Inc.</u>, 213
F.3d 474, 480 (9th Cir. 2000)).  When the nonmoving party bears
the burden of proof at trial, the party moving for summary
judgment may satisfy its burden with respect to the motion for
summary judgment by pointing out to the court an absence of
evidence from the nonmoving party.  <u>Miller</u>, 454 F.3d at 987.

[10]Nor will uncorroborated allegations and "self-serving
testimony" create a genuine issue of material fact.  <u>Villiarimo
v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002);

14

set forth "significant probative evidence" in support of its

position.  T.W. Electrical Service, Inc. v. Pacific Electrical

Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Summary

judgment will thus be granted against a party who fails to

demonstrate facts sufficient to establish an element essential to

his case when that party will ultimately bear the burden of proof

at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the

court must construe all evidence and reasonable inferences drawn

therefrom in the light most favorable to the nonmoving party.

See T.W. Electrical Service, 809 F.2d at 630-31.[11]  Accordingly,

if "reasonable minds could differ as to the import of the

evidence," summary judgment will be denied.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 250-51 (1986).

**DISCUSSION**

I.  **Defendants' Motion for Summary Judgment on Second Amended Complaint**

Following the Order issued April 25, 2006, the claims

for relief that remain under the Second Amended Complaint

include: (I) breach of agreements and misrepresentation; (II)

---

see also T.W. Electrical Service, 809 F.2d 626, 630 (9th Cir. 1987).

[11]At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Bator v. State of Hawai`i, 39 F.3d 1021, 1026 (9th Cir. 1994).

15

alter ego liability; and (III) liability under the theory of piercing the corporate veil.[12]  Defendants argue that because Thornton acted as an undisclosed dual agent for both the Plaintiff and for Defendants, they are entitled to rescind the License Agreements, making them void and unenforceable, and resulting in the dismissal of the First Claim for Relief. Defendants also assert that the Second and Third Claims for Relief under the alter ego/piercing the corporate veil theories must also fail because these claims depend upon the viability of the underlying contract claim in the First Claim for Relief.

  A. <u>Undisclosed Dual Agency Would Defeat the Second Amended Complaint</u>

  An agent owes his principal a fiduciary duty, which includes a duty of loyalty.  The Restatement (Second) of Agency § 387 (1958) provides, "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Williston on Contracts states,

> The primary obligation imposed on an agent by the fiduciary duty of loyalty is to avoid self-dealing with regard to the business of the principal. . . . The fiduciary duty of

---

[12] Plaintiff asserted alter ego liability and piercing the corporate veil as two separate claims for relief.  In the April 25, 2006 Order, however, the Court stated that "'alter ego' liability and 'piercing the corporate veil' are similar theories and are often used interchangeably." <u>See</u> <u>Television Events & Marketing v. Amcon Distributing Co.</u>, 2006 WL 1119155, at *9 n.16 (D. Haw. 2006).  Thus, the Court will address the two claims as one.

> loyalty is not limited to cases of blatant self-dealing, but also requires a fiduciary to avoid any position where his or her own interests or those of any other person whom he or she has undertaken to represent may conflict with interests of the principal.

19 Richard A. Lord, Williston on Contracts § 54:28 (4th ed. 1990).  Specifically applicable to this case is the principle articulated in the Restatement (Third) of Agency § 8.03 (2006), which states, "An agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship." Comment (b) to § 8.03 explains,

> The duty stated in this section is formulated broadly.  So long as the transaction in which an agent acts as or on behalf of an adverse party is connected with the agency relationship, the agent is subject to the duty although the agent does not have direct or indirect responsibility for conducting the transaction on behalf of the principal.  The breadth of this formulation requires that an agent disclose adverse interests to the principal so that the principal may evaluate, as only the principal is situated to do, how best to protect its interests in light of the agent's interest.

It is undisputed that after October 15, 2002, Thornton was the agent of Defendants. See Distributing/TBG, Inc. Reply at p. 6. On October 15, 2002, Thornton was retained by Amcon Beverage Company to assist with marketing and advertising the new beverage operations.  See Distributing/TBG, Inc. CSF Exh. "2", Thornton 5/30/05 Decl. at ¶ 13; Exh. "4", Thornton Depo. at p. 22.  It is not dispositive whether Thornton had the authority to bind his principals in the licensing negotiations with TEAM. As their agent, Thornton owed the Defendants the duty of loyalty even if he had only indirect responsibility for the transaction

17

with TEAM.

The Court finds that Thornton knew of the existence of TBG, Inc. and that TBG, Inc. was the intended Licensee, prior to the signing of the License Agreements by TEAM.  Thornton acknowledges and recognizes a document that was circulated at a meeting on September 16, 2002, that states that a yet-unnamed wholly owned subsidiary of Distributing would be created to secure, among other things, the exclusive agreement to produce and distribute XTERRA branded beverages and nutrition bars. Thornton worked with the advertising agency that named the new entity "The Beverage Group, Inc."  In December of 2002 Thornton attended a board meeting at which the business plan for TBG, Inc. was presented, stating that TBG, Inc. was to be created as a wholly owned subsidiary of Distributing, and included references to its licensing agreements with TEAM for "our Xterra brand." See Distributing/TBG, Inc. CSF, Exh. "4" to Thornton Depo. at pp. 6,8.  Thornton submitted an invoice for payment to TBG, Inc. on December 27, 2002, and he became a director for TBG, Inc. on January 3, 2003.  See Distributing/TBG, Inc. CSF Exh. "4," Thornton Depo. at pp.  32, 83-84.  Kiely signed the License Agreements for TEAM on or about January 12-15, 2003. See Distributing/TBG, Inc. CSF Exh. "2" at ¶ 10.  Finally, in their Oppositions, Plaintiff and Counter Defendants' only response to Defendants' assertion that Thornton knew that TBG, Inc. existed

18

and was the intended Licensee was that Thornton "never knew that
Defendants secretly intended TBG, Inc. to be an underfunded shell
corporation and alter ego." <u>See</u> TEAM Opp. to Distributing/TBG,
Inc. Motion, CSF at ¶ 10. Therefore, it is clear that Thornton
knew, prior to the signing of the Agreements by TEAM, that TBG,
Inc. existed and that it was the intended Licensee.

    A finding that Thornton was operating as an undisclosed
agent or dual agent for TEAM in violation of his fiduciary duty
to the Defendants would result in the dismissal of the Second
Amended Complaint.  In the April 25, 2006 Order, the Court
concluded that although neither Wright, AC, nor Distributing
signed the License Agreements, they could potentially be liable
under the theories of promoter liability or as agents of
undisclosed principals.  These theories of liability were
dependent upon resolution of the issue of whether TEAM knew TBG,
Inc. existed and was to be the Licensee at the time the
agreements were signed.  <u>See</u> <u>Television Events and Marketing</u>,
2006 WL 1119155, * 12, 14 (D. Haw. 2006). Defendants argue that
if during the negotiations of the License Agreements Thornton was
also TEAM's agent, Thornton's knowledge about the existence of
TBG, Inc. and that it was the intended Licensee would be imputed
to TEAM, and Defendants Wright, AC, and Distributing could not be
held liable. <u>See</u> <u>Imperial Finance Corp. v. Finance Factors, Ltd.</u>,
53 Haw. 203, 206, 490 P.2d 662, 664 (Haw. 1971)("the knowledge of

an agent which he is under a duty to disclose to his principal or to another agent of the principal, is to be imputed to the principal"); see also Great Divide Insurance Co. v. AOAO Maluna Kai Estates, 2006 WL 2830885, at *6 (D. Haw. 2006) ("notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal")(citing Restatement (Third) of Agency § 5.03 (2006)).

In addition, if Thornton was an undisclosed agent of TEAM in breach of his fiduciary duty, Defendants would be entitled to rescind the contract.  When an agent breaches the duty of loyalty and acts on behalf of an adverse party, the principal may recover the benefits acquired by the agent through the agent's breach and may rescind the contract entered into with a third party who participated in the agent's breach.  See Property House, 68 Haw. 371, 378, 715 P.2d 805, 810; Anderson v. Anderson, 293 Minn. 209, 216, 197 N.W.2d 720, 724 (Minn. 1972); see also Restatement (Third) of Agency §§ 8.02 cmt. e, 8.03 cmt. d.  Without an enforceable agreement, Plaintiff's claim for breach of the License Agreements and misrepresentation against the Defendants could not survive.

Liability under the alter ego doctrine and the theory of piercing the corporate veil are not independent causes of action, but are means to impose liability on an underlying cause

20

of action.  See Robert's Hawaii School Bus, Inc. v. Laupahoehoe

Transportation, 91 Haw. 224, 241, 982 P.2d 853, 870 (Haw. 1990).

If the underlying cause of action for breach of the agreement is

dismissed because Defendants are allowed to rescind the License

Agreements, the claims of liability for the remaining Defendants

under alter-ego or veil-piercing theories would also be

dismissed.

In sum, the viability of the Second Amended Complaint

rests on whether Thornton acted on behalf of an adverse party in

a transaction connected with his agency relationship with the

Defendants without their consent.

> B.   Whether Thornton was an Undisclosed Dual Agent for
>      the Defendants and TEAM

In diversity actions, federal courts apply state law

when deciding whether an agency relationship exists.  See Fenton

v. Freedman, 748 F.2d 1358, 1361 (9th Cir. 1984).  This action

was brought under diversity jurisdiction pursuant to 28 U.S.C. §

1332(a) and the License Agreements, by their own terms, are to be

resolved according to Hawaii law.  See TEAM CSF, Exh. "M" at p.

10. Under Hawaii law, the existence of agency is a question of

fact, and "where the facts pertaining to the existence or

nonexistence of an agency are conflicting or conflicting

inferences may be drawn from the evidence, those are questions of

fact for the determination of the [factfinder]." State Farm Fire

and Casualty Co. v. Pacific Rent-All, Inc., 90 Haw. 315, 327, 978

21

P.2d 753, 765 (Haw. 1999)(citations omitted).

In May of 1997, Thornton became an agent of TEAM by letter agreement, in which Thornton agreed to be TEAM's sales representative to negotiate and secure licensing agreements for TEAM's various events and logos, including the XTERRA brand. See Distributing/TBG, Inc. CSF Exh. "10." TEAM held Thornton out as its agent, providing in the agreement that he carry a TEAM business card with the title of Vice President. Id. TEAM argues that at all times, Thornton was not its agent but an independent contractor. Simply characterizing Thornton as an independent contractor, however, does not negate his status as an agent. The Restatement (Second) of Agency § 14N (1958) provides,

> '[I]ndependent contractor' is a term which is antithetical to the word 'servant', although not to the word 'agent'. In fact, most of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is used in the Restatement of this Subject, since they are contractors but, although employed to perform services, are not subject to the control or right to control of the principal with respect to their physical conduct in the performance of the services. However, they fall within the category of agents.

Thus, even if Thornton was an independent contractor for TEAM, he still could have been its agent. The May, 1997 agreement provided that he was contracted to perform services on behalf of TEAM and he was held out as their representative. The terms of the agreement clearly established an agency relationship between TEAM and Thornton.

Plaintiff and Counter Defendants argue that even if an

agency relationship was created by the 1997 agreement, such agency was terminated prior to Thornton's becoming an agent for the Defendants.  To support this assertion, Plaintiff and Counter Defendants argue that TEAM's contractual relationship with Thornton was effectively terminated upon mutual agreement after September 28, 1998 when TEAM ceased paying $1000 monthly advances to Thornton.  See TEAM Opp. at p. 6; Thornton 3/15/07 Decl. at ¶ 8.  Plaintiff and Counter Defendants also state that, at the latest, the agency between TEAM and Thornton ended by September 1, 1999, when Thornton received the last commission payment.  See TEAM CSF ¶ 2. They offer these two dates, about a year apart, as the termination date of the 1997 agreement.  The lack of precision may suggest that no mutual agreement or meeting of the minds to terminate ever occurred.  Thornton alleges that he did not perform any services for TEAM between September 28, 1998 and April 21, 2003, when he agreed by letter to attempt to secure a buyer for TEAM, and states that he did not receive any money from TEAM between September 1, 1999 and May 27, 2003.  See Thornton 3/15/07 Decl. at ¶¶ 10-12, 16.

The 1997 agreement between TEAM and Thornton provided for cancellation by 30 day written notice, and Counter Claimants argue that because there is no evidence of a written notification terminating their May 1997 agreement, the agreement continued to be in effect through May, 2003.  See Distributing/TBG, Inc. Reply

at pp. 3-4.   It seems unusual to terminate an agency relationship with a person whom the principal holds out as its Vice President without any written evidence of such termination.   Nevertheless, the Restatement (Second) of Contracts § 283 (1981) states that an oral agreement to rescind a contract is enforceable even if there was a provision in the earlier contract that stated that it can be rescinded only in writing. Likewise, Restatement (Third) of Agency states, "regardless of whether principal and agent have agreed on a time or a mechanism for termination, their mutual consent at any time is effective to terminate the agent's actual authority." Thus, TEAM and Thornton could have mutually orally agreed to terminate the 1997 agreement despite the provision of the contract requiring rescission to be in writing.   Thornton and Kiely both state in their declarations that as of September, 1998 the 1997 Letter Agreement between Thornton and TEAM was terminated. See Kiely 3/15/07 Depo. at ¶ 5; Thornton 3/15/07 Depo. at § 8.

TEAM wrote Thornton three checks in May and June of 1999 for a total of $11,600, that were each labeled "commission." The $25,000 check issued on May 27, 2003 was also labeled "commission" and noted it was for "consulting and friendship." This suggests that the final commission check for the Beverage Group deal may have been written under the same 1997 agreement as the earlier checks.   However, there is no evidence that the

24

$25,000 constituted 25% of net revenue, as provided by the 1997 agreement. Counter Claimants argue that a document dated May 26, 2006 identifying Thornton as the Director of Licensing and Sponsorship Sales for TEAM is evidence that Thornton continued to be TEAM's agent through 2006. See Distributing/TBG, Inc. CSF, Exh. "11." At the hearing, Plaintiff and Counter Defendants clarified that this document was produced in response to an attempt to clarify what Thornton's title was on his business card back in 1997-1998. The title itself comes from a document that dates back to the late 1990s. It remains unclear whether and at what point TEAM and Thornton's 1997 agency relationship ever terminated. The critical time frame is whether Thornton was acting as an undisclosed agent for TEAM during negotiation and signing of the License Agreements in the fall of 2002 and early 2003.

Comments from the Restatements (Second and Third) provide guidance as to whether an agent has acted as or for an adverse party.[13] Restatement (Third) of Agency § 8.03 cmt. b (2006) states,

An agent is deemed to act as or for an adverse party in a

---

[13] Hawaii courts frequently look to the various Restatements of Agency. See e.g.,; Association of Apartment Owners of Maalaea Kai, Inc. v. Stillson, 108 Haw. 2, 29 (2005); Luke v. Gentry Realty, Ltd., 105 Haw. 241, 247 (Haw. 2004) State v. Hoshijo ex rel. White, 102 Haw. 307, 318 (Haw. 2003); Corps Constr., Ltd. v. Hasegawa, 55 Haw. 474, 476 (1974); Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 85 Haw. 300, 318 (Haw. Ct. App. 1997).

transaction when the agent has a substantial economic
interest in the party with whom the principal deals.  An
agent's interest may also be adverse to the principal's
interest when a transaction is between the principal and an
associate of the agent's, such as a close friend or
relative.

It appears that Thornton may have had a substantial interest in

the Licensing Agreements with TEAM, in the form of a commission

payment for any business he successfully generated for TEAM and a

close friendship with Kiely.  Thus, under this formulation,

Thornton could be deemed to have acted as or for an adverse party

to his principals, the Defendants.  Plaintiff and Counter

Defendants counter that the payment was a surprise, gratuitous

gift and that Thornton never had an expectation that he would be

paid by TEAM for his role in introducing the parties, just as

Thornton did not expect to be paid for introducing Wright and

Moody.  See Thornton CSF, Thornton Decl. at ¶¶ 14, 16.

    Comment e, titled "Evidence", of the Restatement

(Second) of Agency § 391 (1958) provides,[14]

    The receipt of anything of a substantial nature from an
    adverse party to transaction is evidence that the agent is
    acting on behalf of such person and is sufficient, without
    more, to sustain a judgment against the agent.

This factor also tends to support the conclusion that Thornton

was acting on behalf of an adverse party because he received

$25,000 from TEAM for his role in the transaction.

_____

    [14] The Restatement (Second) of Agency § 391 (1958) is the
counterpart to § 8.03 in the Third Restatement.

Plaintiff and Counter Defendants assert that it was not improper for Thornton to accept the $25,000 payment from TEAM because such payment was merely a finder's fee for introducing Wright and Kiely.  The common law and Restatement (Second) of Agency distinguish between a "finder" or "middleman," who may receive compensation from both sides to a transaction, and a "broker" or "agent," who may not receive a commission from the opposing side without breaching his fiduciary duty to his principal. See Property House, Inc. v. Kelley, 68 Haw. 371, 715 P.2d 805 (Haw. 1986); Restatement (Second) of Agency § 391 cmt. d (1958).[15] Articulating Hawaii's law on the issue, the court in Property House stated,

> A "finder" or "middleman" is one whose employment is limited to bringing parties together so that they may negotiate their own contract.  He has no power to and does not negotiate the terms on which the principals deal.  He must not be invested with the least discretion in the matter of advising or negotiating the sale or purchase of property, and neither party must not have the right to rely on him for the benefit of his skill or judgment.  Unlike a broker, a middleman is in no fiduciary relationship to his principal nor under any obligation not to receive compensation from the opposite party to the transaction. On the other hand, a broker, in addition to his duties as a middleman, is

---

[15]  Comment (d) to the Restatement (Second)of Agency § 391 states,

> If a broker is employed not only to bring parties together but to arrange terms, make representations, or give advice, action for both parties without each [sic] principal's knowledge is a breach of duty to each.  If, however, he has no independent initiative and is employed only to introduce the parties to each other, or if he is entitled to retain all above [sic] a fixed sum, he has no duty to disclose that he is acting for the other party.

employed to use discretionary authority for the benefit of his employer and act for his best interests.

68 Haw. at 378-79, 715 P.2d at 811 (internal quotations and citations omitted).  Likewise, the district court in the District of Columbia held, "The distinction between a 'broker' and a 'finder' depends on the individual's involvement in the transaction.  If the 'finder' takes any part in the negotiations, no matter how slight, he will be considered a 'broker,'" <u>Kassatly v. Yazbeck</u>, 734 F. Supp. 13, 15 (D.D.C. 1990)(finding that plaintiff was not a mere 'finder' because he did more than introduce the parties: he advised the parties about the proposals and participated in negotiations).  <u>See also LuMetta v. United States Robotics, Inc.</u>, 824 F.2d 768,  (9th Cir. 1987) (finding that plaintiff was a broker rather than a finder because he did more than introduce the parties: he provided test equipment, arranged for its repair, and generally remained in contact with the other party).

On its check to Thornton, TEAM described the payment as a "commission" rather than a "finder's fee."  Black's Law Dictionary defines "commission" as "[a] fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction." <u>Black's Law Dictionary</u> 286-87 (8th ed. 2004).  A "finder's fee," by contrast, is defined as "[t]he amount charged by one who brings together parties for a business opportunity." <u>Id.</u> at 664. The check to Thornton from

28

TEAM was noted, "for consulting and friendship," suggesting that it was compensation for services beyond the introduction.  While Plaintiff's notation on the check to Thornton as a "commission" and that it was for "consulting" is not conclusive of a dual-agency relationship, it tends to suggest that Thornton was not a mere finder or a middleman in the transaction.  Indeed, the 1997 agreement between TEAM and Thornton provided for compensation by a 25% commission. Thornton argues that the 1997 agreement called for payment by way of "commissions" for his services as a finder. It also does not appear that the $25,000 check constituted 25% of the net revenue from the Group/TEAM deal as otherwise provided in the 1997 agreement.

Plaintiff and Counter Defendants argue that after introducing Wright and Kiely, Thornton did not engage in any activity on TEAM's behalf, so he was a mere "finder."  See Kiely Decl. (3/15/07) at pp. 5-6, 8-9.  Furthermore, Plaintiff and Counter Defendants argue that Thornton did not participate in the substantive negotiation of the License Agreements, and that the material terms of the agreements were set before he became the Defendants' agent.  See TEAM CSF at ¶ 9. Plaintiff and Counter Defendants cite Lycan v. Walters, 904 F. Supp. 884, 898 (S.D. Ind. 1995), which held that the mere passage of funds evinced by four checks labeled "finder's fee" for $5,125, without more, did not illustrate a genuine issue of material fact that an agency

29

relationship existed.  Plaintiff and Counter Defendants argue
that the $25,000 check was for Thornton's role in introducing the
parties back in February and July of 2002, prior to his becoming
the Defendants' agent in October of 2002.  Thus, they argue, the
payment alone does not establish a dual-agency relationship ever
existed. Nor was it improper for Thornton to accept the payment
for actions he undertook prior to becoming the Defendants' agent.

        The Defendants argue that <u>Lycan</u> can be distinguished
from the instant case because there is evidence that Thornton did
more than act as a finder: he received copies of the License
Agreements as early as September of 2002, and Kiely testified he
spoke with Thorton "every couple of weeks . . . about what was
happening on their side, their side being Amcon's and Bill
Wright's side."  See Distributing/TBG, Inc. CSF Exh. "3", Kiely
Depo at p. 37; Exh. "4" Thornton Depo. at pp. 100-101.
Defendants argue that this evidence shows that Thornton was
working for Kiely/TEAM during the negotiations of the License
Agreements, but these statements could also indicate that Kiely
was merely dealing with Thornton as the Defendants' agent.
Defendants Distributing and TBG, Inc. assert in their Reply that
TEAM sent Thornton drafts of the License Agreements <u>for</u>
<u>Thornton's review</u>. <u>See</u> Distributing/TBG, Inc. Reply at p. 6
(emphasis added). In their pleadings and at the hearing, however,
Defendants were unable to point to any direct evidence that TEAM

30

sent the License Agreements so that Thornton could review them for TEAM, or that Thornton provided comments and review for TEAM. Plaintiff and Counter Defendants' argument is equally plausible: that TEAM sent Thornton the drafts so he could pass them along to Defendants as a "conduit" and provide comment and review for Sparks.  In an earlier deposition, Kiely stated that he conducted negotiations with Wright and Thornton.  See Distributing/TBG, Inc. CSF Exh. "3", Kiely Depo. at 174.  However, Kiely later states that it was his understanding based on his discussion with Wright that only Wright, Sparks, and Parsons—not Thornton—had the authority to discuss and determine the License Agreements.  See TEAM Reply CSF at ¶ 7; Kiely 3/15/07 Decl. ¶¶ 15-16.[16]  On the one hand, this testimony supports the conclusion that Thornton participated in negotiations beyond introducing the parties, but it also indicates that Thornton's negotiation activities were conducted on behalf of the Defendants, not TEAM. Kiely testified that he alone negotiated on behalf of TEAM. See Distributing/TBG, Inc. CSF Exh. "3", Kiely Depo. at p. 174. In a similar fashion, Thornton's statement that he negotiated with TEAM on behalf of

---

[16] The Court will disregard Kiely's statements in his declaration of March 15, 2007, to the extent that it contradicts his earlier deposition testimony. A party cannot create an issue of material fact through a declaration that contradicts his prior deposition testimony.  See Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc., 397 F.3d 1217, 1225 (9th Cir. 2005); Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1008 (9th Cir.1998).

the Defendants to reduce Group's fee and payment schedule and
that he reviewed and commented on the agreements for Sparks cuts
both ways: he participated beyond the introduction of the
parties, but his actions appeared to be on behalf of the
Defendants.  See Distributing/TBG, Inc. CSF Exh. "4," Thornton
Depo. at pp. 30-31.

        At summary judgment, the Court makes all inferences in
a light most favorable to the non-moving party.  It is unclear
whether the $25,000 check was payment for Thornton's services as
a finder prior to becoming the Defendants' agent or as payment
for services rendered on TEAM's behalf after the agency with the
Defendants was established.  Thornton may not have had a duty to
disclose a finder's fee for his activities that occurred prior to
his agency relationship with Distributing.  However, it would be
a breach of his fiduciary duty to accept compensation from TEAM
for actions that he undertook while an agent for the Defendants
without disclosure to and the consent of the Defendants.  Thus,
there are genuine issues of material fact as to whether Thornton
engaged in services on TEAM's behalf in connection with the
TEAM/Group transaction during his agency relationship with the
Defendants.

        Plaintiff and Counter Defendants argue in the
alternative that even if there was a dual agency, the historical
relationship between TEAM and Thornton was disclosed to

32

Defendants.   The Restatement (Third) of Agency § 8.06 provides,

> (1) Conduct by an agent that would otherwise constitute a
> breach of duty as stated in §§ 8.01, 8.02, 8.03, 8.04, and
> 8.05 does not constitute a breach of duty if the principal
> consents to the conduct, provided that
> (a) in obtaining the principal's consent, the agent
>       (i) acts in good faith,
>       (ii) discloses all material facts that the agent knows,
>       has reason to know, or should know would reasonably
>       affect the principal's judgment unless the principal
>       has manifested that such facts are already known by the
>       principal or that the principal does not wish to know
>       them, and
>       (iii) otherwise deals fairly with the principal; and
> (b) the principal's consent concerns either a specific act
> or transaction, or acts or transactions of a specified type
> that could reasonably be expected to occur in the ordinary
> course of the agency relationship.

Here, Plaintiff and Counter Defendants argue, in essence, that

because Wright knew of Thornton and Kiely's historical

relationship from the late 1990s, Defendants consented to

Thornton's receipt of a $25,000 commission from TEAM in 2003.

Indeed, in January of 2007, Wright testified in his deposition

that he assumed Thornton was working for Kiely "to this day" due

to their friendship.  See TEAM CSF, Exh. "13" at p. 19.  Thornton

introduced Wright to Kiely back in the late 1990s, Thornton

introduced Wright to Moody in late 2001 about business

opportunities with the XTERRA brand, and Thornton worked for

Wright regarding the Hawaiian Natural Waters deal in 2001.  The

Rule articulated in § 8.06, requires the agent to engage in "full

and fair disclosure" of the material benefit he receives and

requires the principal consent to either the specific transaction

(here, a "commission" for the Group/TEAM License Agreements) or the type of transaction that could be reasonably expected in the ordinary course of business. See § 8.06 cmt. c. Although Defendants may have been aware that Thornton worked for TEAM in the past and that they continued working together more recently, it is undisputed that Thornton did not disclose to Defendants that he received a $25,000 commission from TEAM for the agreements between TEAM and Group.[17]   Nor is it ordinarily allowed that an agent receive a commission from the opposing party for a transaction with his own principals.  See, e.g., Property House, 68 Haw. at 378-79, 715 P.2d at 811. There is nothing in the record that suggests Thornton disclosed and Defendants consented to Thornton's receipt of a $25,000 commission from TEAM.

In conclusion, there are genuine issues of material fact as to whether Thornton acted on behalf of an adverse party in a transaction connected with his agency relationship with the Defendants.   Summary judgment for the Defendants is DENIED.

II. **Counter Claimants' Motion for Summary Judgment on Amended Counterclaim**

As stated in the discussion above, it is disputed whether Thornton was acting on behalf of TEAM with respect to

---

[17]   Defendants assert, and Plaintiff does not dispute, that Defendants first became aware of the $25,000 commission check regarding the licensing agreement with Group to Thornton in the course of discovery for the instant case in April of 2006.

XTERRA brand Licensing Agreements without the consent of his principals, the Defendants.  The existence of issues of material fact precludes summary judgment on the claim that Thornton breached his fiduciary duty. Summary judgment on Count I of the Counterclaim is DENIED.

In Count II, Counter Claimants assert that TEAM engaged in tortious conduct by knowingly assisting Thornton in breaching his fiduciary duty against the Defendants.  Because there are material issues of fact that preclude determination of the underlying issue of whether Thornton breached his duty, summary judgment is inappropriate. Summary judgment on Count II of the Counterclaim is DENIED.

Likewise, all remaining Counts under the Counterclaim depend upon a finding that Thornton breached his fiduciary duty to the Counter Claimants and are precluded from summary judgment by the existence of material issues of fact.  Summary judgment is DENIED for: Count II - Unjust Enrichment/Restitution; Count IV - Duty of Good Faith and Fair Dealing; and Count V - Fraud/Misrepresentation.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motions for Summary Judgment on the Second Amended Complaint and Counterclaim.  The existence of material issues of fact as to whether Thornton was an undisclosed agent of TEAM in

violation of his fiduciary duty to Defendants precludes summary judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 21, 2007.



_____
Alan C. Kay
Sr. United States District Judge

TELEVISION EVENTS & MARKETING, INC. v. AMCON DISTRIBUTING CO., et al., Civ. No. 05-00259 ACK-KSC, Order Denying Defendants' Motions for Summary Judgment on the Second Amended Complaint and Counterclaim.